# JAMES CURTIS HALL *v.* STATE OF MARYLAND

[No. 84, September Term, 1968.]

*Decided January 14, 1969.*

The cause was argued before MURPHY, C.J., and ANDER-
SON, MORTON, ORTH, and THOMPSON, JJ.

*Allan C. Westcott* for appellant.

*Thomas N. Biddison, Jr., Assistant Attorney General,* with
whom were *Francis B. Burch, Attorney General, Julian B.
Stevens, Jr., State's Attorney for Anne Arundel County,* and
*Raymond G. Thieme, Jr., Assistant State's Attorney for Anne
Arundel County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

James Curtis Hall, the appellant, was convicted of sodomy
by the Circuit Court for Anne Arundel County, Judge Matthew
S. Evans presiding without a jury. The sentence imposed was
two years consecutive to the sentence which Hall was then serv-
ing. The questions presented on appeal concern the admissibility
of certain evidence and the sufficiency of the evidence to sup-
port the verdict.

The testimony can be summarized as follows:

James Stuart Aberts, age 23, testified that while he was in-
carcerated at the Maryland House of Correction on January 28,
1967, a riot broke out in the institution at or about the hour of
4:30 to 5:00 p.m. Some of the prisoners seized keys from the
guards and unlocked the cell doors of the remaining prisoners.
Aberts testified that after his cell door was opened he walked
out on the tier and when he was passing cell No. 4, which ad-
joined his own, four persons, of whom Hall, the appellant, was
not one, attacked him and knocked him unconscious. When he
became conscious he was lying on his stomach on a bed in cell
No. 4 with a man, in a supine position, engaged in a sexual as-
sault upon him. While the act continued one of the other per-
sons present yelled "Who is on him now" when another un-
known person stated that "Billy Hall" was on the victim. (The
record shows that Billy Hall was the nickname commonly used
for the appellant). Whereupon the person on his back yelled to
the others to quit hollering his name out and told the victim

that he had better forget his name. Aberts further testified when he heard Hall's voice he recognized it because he had had an argument with him on two separate days some two weeks prior thereto saying "He's got a way of talking, the way they put a lot of drive in their tongue, it is just familiar, I knew it. I'd argued with him before and I knew that was his voice." He further testified that the lights were out and it was too dark for him to identify Hall except by his voice.

Ronald Kurz, a correctional officer at the Maryland House of Correction, about 24 hours after the riot, went to the medical observation area of the House of Correction where Hall was being held for medical examination and informed Hall that someone was there to see him and requested that he put on his clothes. He accompanied Hall to a room where several bundles of clothes of persons who were undergoing medical examination were in neat piles around the room. Hall looked over the piles of clothing until he found what was obviously his and put on undershorts, trousers and shoes. After the officer observed that the shoes fitted, he told Hall that he could stop getting dressed because the man who wanted to see him was already there. Sergeant Snyder of the Maryland State Police, who was standing at the door, then asked Hall about the stains on the clothing which were located on front of the trousers and around the fly area of the undershorts. Hall was directed to undress and Sergeant Snyder took the clothes. On cross-examination Kurz stated that the undershorts showed they were size 34, that the belt was size 32, and the trousers measured at the trial were 30½ inches around the waist. He further testified that the clothing Hall put on fitted him as well as any other inmate's clothes at the institution. Sergeant Snyder confirmed the testimony of Correctional Officer Kurz and stated that when he asked Hall about the obvious blood stains on the front of the trousers that Hall responded that a lot of people had gotten blood on their trousers during the riot. An examination of the trousers at the laboratories of the Federal Bureau of Investigation showed that blood stains were on the trousers but not on the shorts, and that seminal stains were on both the trousers and the undershorts.

John L. Beard, who at the same trial was convicted of as-

sault in connection with a sodomy attack not directly connected with the present appeal testified for the defense that he was Hall's cellmate and that Hall had stayed in his own cell throughout the riot, and further that he, Beard, had spent much of the time directly in front of their cell talking with Robert Earl Paesch.

Hall testified in his own defense and stated that he spent the entire time of the disturbance in his cell with Beard; that he saw Robert Earl Paesch during the riot. He stated that he had argued with Aberts some two weeks before on two separate days and on the second occasion concluded by saying "Well, we talked and wound up shaking hands and I left, and that was all in December, that was the last him and I had any words or any kind of relationship." He stated that the clothes which he wore to the medical observation area were the same clothes that he had worn during the riot, but that the clothes introduced into evidence were not his except for the belt. Hall testified that he wore size 30 undershorts, and that he remade all of his trousers in the tailor shop so that they fitted him better than otherwise they would have. Hall stated that at the time he was called upon to dress in the area he put on only pants; that he did not put on shoes or undershorts; that he had not seen any of the clothes, except for the belt, that he wore to the medical room; and that the first time he had seen the belt was the day of the trial. In rebuttal the State called Robert Earl Paesch who denied that he had seen Hall at any time during the riot.

Hall contends on appeal that the court committed error in admitting the clothing into evidence because it was not sufficiently connected with him. He argues that its connection is questionable because it might have been mixed up with clothing of other prisoners which was also in the room at the time he was called upon to dress. This contention causes us little concern. All that is required to connect an exhibit to an accused is reasonable probability. *Veihmeyer v. State,* 3 Md. App. 702, 240 A. 2d 649. Hall was directed to put on his clothes, and after looking over the piles of clothes he put on those admitted into evidence. The shoes fitted him and the other clothes fitted him as well as the clothes of other inmates fitted them.

Hall further contends that it was error for the trial court to admit the "hearsay" testimony concerning the conversation between unidentified persons and the criminal while the crime was in progress. Hall complains specifically of the conversation between the unidentified persons rather than the words of the criminal, but we fail to see how the words of the criminal would be at all intelligible unless the words of the bystanders were also admitted.

The Court of Appeals in the case of *Robinson v. State, 57 Md.* 14 gave an excellent discussion of what evidence constitutes *res gestae*. On a charge of forcibly abducting four children of one James McGee, the accused proffered a witness who stated that when the accused and Mrs. McGee came to her house to spend the night she told the witness, out of the presence of the accused, that she had made up her mind not to live with her husband any longer and had left home and taken the children with her and had gotten the accused to drive the wagon. The Court reversed because of the refusal of the trial court to admit that testimony and quoted with approval 1 Taylor on Evidence § 521 as follows:

> " 'Certain other declarations and acts are admitted as original evidence, being distinguished from hearsay by their connection with the principal fact under investigation.
>
> " ' The affairs of men consist of a complication of circumstances so intimately interwoven as to be hardly separable from each other. Each owes its birth to some preceding circumstance, and in its turn becomes the prolific parent of others, and each, during its existence, has its inseparable attributes, and its kindred facts, materially affecting its character, and essential to be known, in order to a right understanding of its nature. These surrounding circumstances may always be shown to the jury along with the principal fact, provided they constitute parts of what are termed the *res gestae*, and whether they do so or not must in each particular case be determined by the judge in the exercise of his sound discretion, according to the

degree of relationship which they bear to that fact;' and then after giving cases in which such proof was admitted, the author goes on to say: 'So also where a person enters upon land in order to take advantage of a forfeiture to foreclose a mortgage, to defeat a disseisin or the like; or changes his actual residence or domicile, or is upon a journey or leaves his home, or returns thither, or remains abroad, or secretes himself, or in fine does any other act material to be understood; his declarations made at the time of the transaction, and expressive of its character, motive or object are regarded as "verbal facts," indicating a present purpose and intention, and are therefore admitted in proof like any other material facts.' "

Professor Wigmore in 6 Wigmore *Evidence* § 1791 says that utterances serving to identify are admissible as every other circumstance of identification would be under his rule that verbal acts are admissible because the hearsay rule is not applicable. 6 Wigmore, *Evidence* § 1745.

In 1 Wharton *Criminal Evidence* § 279 (12th Edition) the strict rule is as follows:

"When strictly defined, *res gestae* refers to those exclamations and statements made by either the participants, victims, or spectators to a crime immediately before, during, or immediately after the commission of the crime, when the circumstances are such that the statements were made as a spontaneous reaction or utterance inspired by the excitement of the occasion and there was no opportunity for the declarant to deliberate and to fabricate a false statement."

At page 627 he cites *Cohen v. State,* 173 Md. 216, 195 A. 532, *cert. denied,* 303 U. S. 660, 58 S. Ct. 764, 82 L. Ed. 1119 as authority for the proposition that Maryland follows the broadest possible rule as to what constitutes *res gestae*. Perhaps the rule is formulated most clearly by Professor McCormick in McCormick *Evidence* (1954) § 274 at 586:

"If there is any common element or concept present in all these variegated uses of the term *res gestae* it is

a very rudimentary one, namely the notion that evidence of a concededly relevant act or condition may bring in likewise the words which accompanied it. This represents a broadening of the original employment of the term which denoted words accompanying the *principal litigated fact,* such as the murder, collision or trespass, which is the subject of the action. This older meaning is still often reverted to, and serves to narrow the usefulness of the doctrine without perceptible gain. The general notion of words accompanying an act or situation involves also some requirement of concurrence, or close relationship, *in time* between the words and the act or situation. Here again the narrowness or liberality in the application of this requirement is a measure of the scope of the usefulness of *res gestae* in the particular jurisdiction.

"Perhaps we may discern two main policies or motives in the recognition of *res gestae* as a password to the admission of evidence. Surely one is a desire to permit the witness to tell his story in a natural way by telling all that happened at the time of the narrated incident including those details which give life and color to the story. Truth is a seamless web and the naturalness with which the details fit each other gives confirmation to the whole account. The other policy, most emphasized in the last generation under the leadership of Wigmore, is the recognition of spontaneity as the source of special trustworthiness. This quality of spontaneity characterizes in greater or less degree nearly all the types of declarations which have been labeled *res gestae.*"

See: 2 Jones on *Evidence* § 319 at 598 (5th Edition) wherein it states:

"The commonest instance of the admission of evidence under the res gestae doctrine is that of the introduction of declaration by a party to the transaction in suit, uttered at the time of the occurrence, and tending to explain the facts thereof.

"On the same principle, evidence is received to show complaints and statements of an injured person, made at the time of the harmful occurrence, both as to bodily suffering and the circumstances of the occurrence. The facts and circumstances surrounding the occurrence in issue may also, it has been held, be admissible as a part of the res gestae. Of course the rule applies equally to declarations of persons who were not actual participants in the event but who were observers thereof."

In a civil case in *McBriety v. Phillips*, 180 Md. 569, 26 A. 2d 400, 404 the Court of Appeals in discussing *res gestae* said:

"Under the rule of res gestae, conversations of parties in the course of a transaction are admissible when the words are spontaneous and so closely related to the principal transaction as to explain its character. 1 Jones on Evidence, §358; 6 Wigmore on Evidence, §1776; 20 Am. Jur., Evidence, §§ 662, 680. Such utterances, irrespective of their trustworthiness as assertions, are received as verbal parts of the entire act. In upholding this rule Justice Swayne said: 'In the complexity of human affairs, what is done and what is said are often so related that neither can be detached without leaving the residue fragmentary and distorted. There may be fraud and falsehood as to both; but there is no ground of objection to one that does not exist equally as to the other. * * * The tendency of recent adjudications is to extend rather than to narrow, the scope of the doctrine. Rightly guarded in its practical application, there is no principle in the law of evidence more safe in its results.' *Travellers' Insurance Co. v. Mosley*, 8 Wall. 397, 408, 19 L. Ed. 437, 441."

In *Alexander v. State*, 198 Md. 395, 84 A. 2d 98, the Court of Appeals considered this specific problem when during the time of a gambling raid various unknown persons called and asked to speak to "Melvin" or "Melvin Alexander," the appellant. The Court had held that such evidence was admissible as part of the *res gestae* and that it was unnecessary to identify

the callers in order to make the evidence admissible as to identity.

Hall further contends that the evidence would have been inadmissible because of a lack of foundation showing that the anonymous persons had had an opportunity to observe the fact that Hall had been the participant in the crime at the moment. He cites 3 Wigmore § 1445 at 177 (2nd Edition), 1 Wharton *Criminal Evidence* § 310 at 723-24 (12th Edition), *Commonwealth v. Noble,* 371 Pa. 138, 88 A. 760, *Commonwealth v. Fergmon,* 330 Pa. 4, 198 A. 99, *Pillard v. Chesapeake S. S. Co. of Baltimore,* 124 Md. 468, 474, 92 A. 1040, but we do not think those authorities are controlling in the present situation. Although the evidence showed that it was too dark for Hall to be recognized at the time the act was being committed the record shows clearly that those involved in the conversations were all in a conspiracy to commit the crime upon the body of Aberts, and we think it reasonable that they would know who was with them and some would know who was actually performing the sodomy at the time of the conversation, regardless of the conditions as to visibility.

To further support the argument, Hall cites our case of *Howard v. State,* 4 Md. App. 74, 241 A. 2d 192 where we held that an out-of-court lineup identification was not admissible unless the witness making the identification was available and in court to testify and to be cross-examined concerning it; but that case is not relevant where the identification evidence is a part of the *res gestae.* We are concerned, here, with what was said at the time the crime was actually being committed and not what was said after the stress of the crime had ceased as in *Howard, supra.*

Although the facts were somewhat different in *Reckard v. State,* 2 Md. App. 312, 234 A. 2d 630, *Lynch v. State,* 2 Md. App. 546, 236 A. 2d 45 and in *Van v. State,* 1 Md. App. 347, 230 A. 2d 109 we reviewed the law of *res gestae* and held that generally all that is said and done during the commission of a crime is admissible as evidence. In fact, it is difficult to imagine anything occurring or being said while crime is in actual progress that would not be admissible under the *res gestae* prin-

ciple, although it is possible that we would so hold under a peculiar set of facts.

Finally Hall contends that the evidence is not sufficient to support his conviction alleging, in oral argument, that the opportunity for a frameup under prison conditions is great. In the case of *Gillian v. State*, 3 Tex. App. 132 (1877) there was a jailbreak and one of the prisoners testified as follows:

> " 'I saw the parties who broke it (the jail) open; they had been after me some time to assist them in breaking the jail; some of the parties were in town early in the night the jail was broken; I saw them on the streets; they told me they were waiting for William Gillian, the defendant. Some of the parties told me to go on the prairie, by Dr. Houston's field, and I would meet the crowd there; they said I would find the defendant, William Gillian, there. I was well acquainted with John Gillian, a brother of the defendant; he was one of the crowd that broke open the jail, and he told me that Billy Gillian would be there. I went back of Dr. Houston's field, as I was directed, and when I got there I found no one. After waiting two or three hours the crowd came. I was not acquainted with the defendant, but there was a man in the crowd that was called William Gillian. * * * I helped break the door (of the jail) open myself. I cannot say, upon my oath, that William Gillian was there. * * * It was dark; there was a man present that the crowd called William Gillian.' "

The Court held that, while such evidence was admissible and not objectionable as hearsay, it, alone, was insufficient to identify the accused as the criminal, saying:

> "It is of too common occurrence for men to assume names—and especially so when about to engage in improper or illegal conduct—and it it too often happens that conspirators, during the accomplishment of their plans, call their confederates purposely by names other than those to which they are entitled, for us to sanc-

tion, as a precedent, that such declarations are of a satisfactory and conclusive character. Proof of identity, to warrant a conviction, should stand upon a surer and more certain basis.

"The evidence, as is said above, is permissible as a fact or circumstance connected with the transaction, to be weighed like any other fact or circumstance in the case, in the determining from the whole evidence whether the identity is proven."

If the only evidence of Hall's participation in the crime were the fact that his name was called out by one of the criminals we would follow *Gillian v. State, supra,* and hold that there was insufficient evidence to support the conviction; but here there was enough other evidence that we cannot say that the trial judge was clearly erroneous within the meaning of Maryland Rule 1086 when he found Hall guilty of sodomy.[1] The trial judge specifically found that the clothes, with blood and seminal stains thereon, had been worn by Hall on the night of the riot. The victim identified Hall's voice saying that it was peculiar in that he "put a lot of drive" in his tongue. We have held that voice identification, coupled with other circumstances, is sufficient to support a conviction, *Nichols v. State,* 5 Md. App. 340. We think there are sufficient, if minimal, other circumstances here to support the verdict.

*Judgment affirmed.*

---

1. For a full discussion of our responsibility in reviewing sufficiency of the evidence see *Williams v. State,* 5 Md. App. 450.