EDWARD MICHAEL GRAY *v.* STATE OF MARYLAND

[No. 589, September Term, 1982.]

*Decided March 2, 1983.*

The cause was submitted on briefs to MOYLAN, WILNER and GARRITY, JJ.

Submitted by *Donald Daneman* for appellant.

Submitted by *Stephen H. Sachs, Attorney General, Diane G. Goldsmith, Assistant Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Ralph Murdy, Assistant State's Attorney for Baltimore City,* for appellee.

MOYLAN, J., delivered the opinion of the Court.

In Paris at the height of the Reign of Terror, Sidney Carton visited a friend at the Bastille, where Charles Darnay awaited execution. Following a quick switch of clothing, Darnay was spirited from the Bastille, posing as the visiting Sidney Carton. In Baltimore on August 19, 1981, the appellant, Edward Gray, visited a friend at the Maryland Penitentiary, where Steven Lloyd Everett was serving a lengthy sentence. Following a quick switch into similar clothing, Everett walked out of the Maryland Penitentiary, posing as the visiting Edward Gray. For his role in the Paris escape, Sidney Carton received immortality at the hands of Charles Dickens. For his role in the Baltimore escape, Edward Gray received a five-year sentence at the hands of Judge Paul Dorf. Heroically, Sidney Carton accepted his fate with the words, "It is a far, far better thing I do than I have ever done." Less heroically, the appellant Gray has taken the present appeal.

Originally, there were two appellants, Edward M. Gray and Frances Robinson, who were both convicted by a Baltimore City jury, presided over by Judge Dorf, of being accessories before the fact to escape. Following the submission of this case to the Court on briefs, without oral argument, Frances Robinson withdrew her appeal. One of the contentions that had been before us, raised exclusively by her, therefore, drops from consideration. The two contentions raised by the appellant Gray remain:

(1) That the evidence was not legally sufficient to sustain the convictions; and

(2) That the trial judge erred in permitting into evidence a note found in the cell of the escapee.

The escape scheme involved at least five and possibly as many as six or seven actors, four of whom are known and one of whom is the appellant herein. The central character in the drama was the escapee himself, Steven Lloyd Everett.[1] He was serving a sentence of sixty years imprisonment received for six armed robbery convictions. He had earlier been involved in several other escape attempts that failed.

The modality of the escape was that Steven Everett posed as the visiting Edward Gray and walked unmolested out the front door of the Maryland Penitentiary. It was necessary to the success of the switching operation that there be a place somewhere in the prison where the path of the visitor and the path of the prisoner might cross. There was one such area where prisoners and visitors intermingled. That was in the common passageway, consisting of a stairway and a corridor, that connected the general visiting room, located on an upper level, with either the "Segregation Visiting Area" or the general prison population, located on a lower level.

Before dealing with the connecting passageway, it will be helpful to distinguish the two different visiting areas located on the two different levels. Though literally within the front door of the Penitentiary, the general visiting room located on the Upper Level is not within the maximum security perimeter. For the general prison population that was permitted to entertain visitors in this area, security was essentially loose. Though prisoners and visitors would sit on opposite sides of long, bench-like tables, there were no glass partitions to impede audial communication or even to prevent touching.

---

1. As of the filing of this decision, Everett is still at large and is on the F.B.I.'s "Ten Most Wanted" List.

It may assist understanding to depict the two levels and the connecting passageway schematically.

A visitor to a normal prisoner would sign in and give the name of the prisoner. Word would be sent down into the prison and some ten to thirty minutes later, depending upon crowding conditions and other factors, the prisoner would arrive at the general visiting room. Prisoners with the privilege of receiving visitors in this Upper Level would approach from the Lower Level. They would be brought from the resi-

dential area of the prison proper to a checkpoint, designated on the diagram as Point "D." There, a guard would unlock the door, frisk the prisoner, and allow him into a long corridor. At the far end of that corridor, the same guard would allow the prisoner to pass through another checkpoint, designated as Point "B," leading to an upward-bound stairway. Although the guard at Point "B" was physically capable of observing the entire stairwell from bottom to top through a glass window, the guard would commonly not undertake such surveillance of the prisoner's walk up the stairs, particularly if the guard was engaged in watching others who were in the corridor. At the top of the stairway, the prisoner would rap and another guard located at Point "A" would permit the prisoner to pass into the general visiting room, to move on into the enclosed portion of that room and to receive his visitor. At least one guard, ordinarily, would be proctoring the visiting room, with an eye primarily on preventing the passing of contraband.

By marked contrast, the other visiting area deep within the bowels of the prison, presented a far different security picture. That visiting area, located on the Lower Level and well within the maximum security perimeter, was exclusively for prisoners who were on segregated status. That status resulted from breaches of discipline, escape attempts, and the resultant classification of the prisoners as high security risks. Since those prisoners could not be permitted access to the general visiting room located on the Upper Level, their visitors had to be brought down and "inside" to them.

Such a visitor would sign in with the guard on the Upper Level, stationed at Point "A." The visitor, moreover, had to be one whose name had been placed on a list of designated visitors by the prisoner himself. Once it was ascertained that the would-be visitor's name was on the list, the visitor would sign in, be frisked, and have his hand stamped with an invisible ink that could be read under ultraviolet light. The guard would unlock the door at Point "A" leading to the stairwell and send the visitor down. At the foot of the stairs, another

guard located in the corridor would unlock the door at Point "B." Then, from inside the corridor, that visitor would be passed through another locked door, located at Point "C," into the Segregation Visiting Area. Within that area, contact between the prisoner and the visitor was minimal. On a one-on-one basis, a guard stood behind every prisoner in that area. The prisoner and the visitor were separated by a wall up to waist level and then by a glass partition. They could not touch; they could speak to each other only via telephones located on their respective sides of the wall.

The guard on duty at Point "A" on the Upper Level thus handled two classes of persons. He passed visitors from the outside down through Point "A" to visit prisoners on segregated status and then received those visitors back through Point "A" and sent them on to the outside world. He also received upward-bound prisoners through that checkpoint, sent them into that part of the general visiting room where prisoners were confined, and then sent the prisoners back through Point "A" to the interior of the prison.

The guard on duty in the corridor handled the same two classes of persons. He received inward-bound visitors at Point "B" and sent them through Point "C" into the segregation visiting room. He received ordinary prisoners through Point "D" and sent them up to the general visiting room through Point "B."

It will thus be observed that a prisoner who is upward-bound to the general visiting room will traverse the same connecting passageway (both the corridor and the stairway) as will traverse the visitor who is downward-bound to the Segregation Visiting Area. On August 19, 1981, it was, therefore, necessary for the escaping prisoner, Steven Everett, to be upward-bound through this passageway shortly after the visitor, Edward Gray, had moved downward through that same passageway and was still within the Segregation Visiting Area.

The ploy to get Edward Gray down through the passageway was to have him visit a prisoner then "on segregation," Charles Hatfield. Hatfield was serving life plus twelve

years for first-degree murder, armed robbery, escape, and kidnapping. A number of prison infractions operated to place him on segregated status. He had known the escapee, Steven Everett, for at least three years. He did not know Edward Gray and had never seen him prior to the arranged visit of August 19. Several weeks before the escape, however, he received word via the prison "grapevine" that he should place the name of Edward Gray on his visitor's list. He not only did so but testified that he received payment in "reefers" for agreeing to receive this stranger as his visitor.

On August 19, Gray signed in as Hatfield's visitor at 9:45 a.m. He signed his name in a visitor's log and had his hand stamped with the invisible ink. The code word for the day was "HALT." Gray was wearing dark glasses, was clean-shaven, and had a short haircut. In general size, build, race, and sex, he resembled the escapee, Steven Everett. On the day of this visit, he was wearing a very prominent tee shirt, with yellow sleeves and a large sign of the zodiac across the front of the shirt. Edward Gray was thus at 9:45 a.m. through the common passageway and down "inside" the prison.

Testimony also revealed that, for purposes of the "grapevine," certain prison cells face outward on Eager Street and that both voice and visual communication are common between those prisoners and civilians standing on Eager Street.

Within ten minutes of the time that Edward Gray was passed down into the prison through Point "A," his ultimate codefendant, Frances Robinson, appeared in the General Visiting Area for the purpose of visiting Steven Everett. By 9:55 a.m., word had been received by Sergeant Cusick in cell block "B" that Everett was wanted in the General Visiting Area. Three significant observations were testified to by Sergeant Cusick. As a general routine, Everett and other prisoners would spend fifteen to twenty minutes in washing, primping, and generally tidying themselves up for the impending visit. On this occasion, Everett was uncharacteristically down before Sergeant Cusick from his

cell on the fifth tier within two minutes. Sergeant Cusick testified, moreover, that Everett, as a regular habit, received his visitors in his best civilian attire (as was permitted by Penitentiary rule). On this occasion, uncharacteristically, he showed up before Sergeant Cusick in his blue prison shirt. During most of his life in the prison, furthermore, Everett had a beard, a mustache, and long, shoulder-length hair. This was the Steven Everett known to most of the guards. Within a few weeks prior to the escape, however, Everett suddenly had both his beard and mustache shaved off and his hair cut short. This, to reiterate, more closely resembled the appearance of Edward Gray.

Sergeant Cusick escorted Everett to Point "D," where he was turned over to the guard at that point and allowed into the corridor. That corridor, with its three entrances into (1) the prison generally ("D"), into (2) the Segregation Visiting Area ("C") and into (3) the stairwell ("B") leading to the Upper Level, was generally known among the prison population as "The Level." The guard in charge of "The Level" that morning was known as "J.J." "J.J." remembered receiving Steven Everett through Point "D" shortly after he had received the visitor, Edward Gray, and moved him off through Point "C" into the Segregation Visiting Area. Following routine procedure, "J.J." passed Everett through Point "B" to the upward-bound stairway. Because he had four or five other persons to supervise in the corridor, "J.J." did not maintain a visual surveillance of Everett as he moved up the stairs. Everett had vanished into thin air.

When the prison was searched following the discovery of the escape shortly thereafter, a blue prison shirt was found on the stairway that leads from "B" up to "A." The guard at "A" remembered a man resembling the visitor, Edward Gray, receiving permission to leave. The man was wearing a tee shirt resembling the one that Gray had worn when he entered. The man was wearing dark glasses just as Gray had been wearing. When the ostensible visitor passed his hand under the ultraviolet light, the code word "HALT" was clearly discernible. He signed out as Edward Gray in the visitor's log and walked out of the Maryland Penitentiary.

Minutes thereafter, Frances Robinson came up to that same guard and, without explanation, cancelled her requested visit with Steven Everett. She abruptly left the prison.

A few minutes later, the real Edward Gray attempted to terminate his visit to the Penitentiary. When the guard noticed that he was moving the pen above the name "Edward Gray" but that the pen was not touching the paper, he discovered that two persons were attempting to pass through checkpoint "A" and into the outside world under the same name. The entire prison went on immediate alert and it was shortly thereafter discovered that Steven Everett was the escaped prisoner.

Within thirty minutes, Sergeant Cusick searched Everett's cell, to which no one else had had access. A bottle of "makeup" was found in the cell. On the same tier of the same wing, a rubber stamp was discovered, which bore the code word "HALT." It was also revealed that the prisoners could easily have gotten access to the invisible ink, which was stored in one of the prison offices. Of greater significance, Sergeant Cusick also found eight small scraps of torn paper floating in the toilet bowl of Everett's cell. When he pieced them together, the following message was revealed:

> Man, Ed went, Ed went in to Hat two minutes ago. All is cool with him. Then Fran came back to the window and I had to tell her, hurry, go and hurry up so, you got to hurry when they call you. J.J. on level, maybe one more.

### Legal Sufficiency of the Evidence

The first contention raised by the appellant is that the evidence against him was not legally sufficient to sustain the conviction. A contention as to legal sufficiency is a broad enough "catch-all" to embrace any number of subtle issues. We will scrupulously confine our response to the argument with respect to, and theory of, evidentiary insufficiency advanced by the appellant at the trial below and in brief before us. We will not reach out to deal with other questions

that might have been raised but were not. Maryland Rule 1031 c; *von Lusch v. State,* 31 Md.App. 271, 281-282, 356 A.2d 277 (1976), *rev'd on other grounds,* 279 Md. 255, 368 A.2d 468 (1977); *Van Meter v. State,* 30 Md.App. 406, 407-408, 352 A.2d 850 (1976). What, then, was the appellant's argument with respect to evidentiary insufficiency? At the end of the entire case, the very raising of the issue as to a directed verdict was *pro forma* in the extreme. The defense rested its case and the State indicated that it had nothing to offer by way of rebuttal. The entire exchange on the question of motions for acquittal consisted of the following:

> "THE COURT: All right, for the record, you all renew your motions?
>
> MR. NEWBURGER: Yes.
>
> MR. GLASS: Yes.
>
> THE COURT: Same motion, same arguments at this time. I would, based on the law and based on the discussion we had before, I deny the motions at this time."

Referring back to the earlier motion made and argued at the end of the State's case, which was simply renewed at the end of the entire case, we note that the argument made by defense counsel consumed ten pages of trial transcript. At the beginning of that argument, defense counsel sounded the theme that "the only fact that has been proven by the State is that Mr. Gray signed in as a visitor to see Hatfield, who was in segregation." The theme was iterated and reiterated that the prison authorities had been derelict in allowing Everett to sign out using Gray's name and that the conduct of the appellant Gray himself was totally innocent and innocuous. He stressed the fact that there was no contact between the escapee Everett and the appellant Gray. Every shred of argument dealt with the fact that the very existence of the conspiracy was speculative and there was "nothing linking Gray specifically to the man." The theme that was constantly resounded was that the prison authorities were

embarrassed by the escape, were looking for a scapegoat, and simply fell upon the appellant Gray, who was, in fact, innocent of any misconduct of any variety:

> "It would seem to me that the whole specific impetus of this case is the prison and staff were negligent and sloppy and careless and indifferent. And instead of just admitting this, changing their procedures, maybe disciplining some of their own staff, they are looking for a scapegoat. They are looking for someone to blame it on. So they dream up these schemes that they attribute to Mr. Gray but they haven't proven anything. They haven't proven any contact, they haven't proven anything specific, just a lot of make believe."

What emerges clearly is that the defense theory of the case was not that the appellant might have been guilty of one variety of criminal misconduct rather than another but that the appellant was not guilty of any criminal misconduct at all. The defense argument concluded, "No one has shown that he was there for any felonious purpose or to participate in any felonious escape or in any way contributed to this escape. And I simply believe that there should be a judgment of not guilty. Thank you."

There was no oral argument at the appellate stage of this case. That part of the brief dealing with evidentiary insufficiency (and covering the then co-appellant, Frances Robinson, as well) covered a bare page and a half. To the extent to which it had any thrust at all, it was simply a resounding of the familiar theme that the conduct of the appellant was innocuous and that the State's case was based upon "mere conjecture or speculation." The brief, in this regard, concluded:

> "The evidence against Mrs. Robinson was totally insufficient to merit a conviction. She was in the penitentiary for one half hour, then cancelled the visit.

> The testimony received against Mr. Gray was at most speculative. None of the State's witnesses saw him do anything other than enter the prison, give his correct name, produce proper identification cards and finally enter the visiting room.
>
> In matters of proof a jury is not justified in inferring from mere possibilities the existence of facts, and they cannot make mere conjecture or speculation the foundation of a verdict."

We will deal, therefore, only with the argument that the appellant has raised. We hold that the evidence was legally sufficient to permit the jury reasonably to infer that the appellant Edward Gray played a key, indeed an indispensable, role in this precisely-timed and well-orchestrated escape. *Williams v. State,* 5 Md.App. 450, 459, 247 A.2d 731 (1968); *Metz v. State,* 9 Md.App. 15, 23, 262 A.2d 331 (1970). No explanation was ever offered by the defense as to why the appellant suddenly and strangely paid a visit to the segregated prisoner Hatfield, who was apparently a total stranger.

## The Introduction of the Note

We turn to the question of the admissibility of the torn note, the eight fragments of which were found floating in the escapee Everett's toilet when the first policeman arrived at his cell following the discovery of the escape. The difficulty we may have in enunciating a clear theory (or several overlapping theories) of admissibility in no way erodes the certainty of our holding that the note was admissible. Our decision itself is easy: Judge Dorf was absolutely correct in permitting the note to be received in evidence. For the decision to have any precedential value beyond the facts of this case, however, it is required that we advance some principled theory (or several overlapping theories) of admissibility. Therein lies the rub.

One almost longs nostalgically for the discredited label of "res gestae," notwithstanding its utter repudiation in polite

academic circles.[2] Its sin was its elusive ambiguity. Ironically, that ambiguity may also have been its occasional virtue. Dean Wigmore condemned the phrase because it was a "catch-all" term that referred with careless imprecision to any one of a half dozen theories of admissibility:

"The phrase 'res gestae' has long been not only entirely useless, but even positively harmful. It is useless, because every rule of Evidence to which it has ever been applied exists as a part of some other well-established principle and can be explained in the terms of that principle. It is harmful, because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both. It ought therefore wholly to be repudiated, as a vicious element in our legal phraseology. No rule of Evidence can be created or applied by the mere muttering of a shibboleth. There are words enough to describe the rules of Evidence. Even if there were no accepted name for one or another doctrine, any name would be preferable to an empty phrase so encouraging to looseness of thinking and uncertainty of decision." 6 J. Wigmore, *Evidence* § 1767 (3rd ed. 1940), at 182.

---

2. Professor James Bradley Thayer in 1895 attributed to Massachusetts Judge (later Supreme Court Justice) Oliver Wendell Holmes the following observation on the phrase:

"The man that uses that phrase (res gestae) shows that he has lost temporarily all power of analyzing ideas. For my part, I prefer to give articulate reasons for my decisions."

Professor Edmund Morgan, in his article *A Suggested Classification of Utterances Admissible as Res Gestae,* 31 Yale L.J. 229 (1922), excoriated the phrase in the following terms:

"The marvelous capacity of a Latin phrase to serve as a substitute for reasoning, and the confusion of thought inevitably accompanying the use of inaccurate terminology, are nowhere better illustrated than in the decisions dealing with the admissibility of evidence as 'res gestae.' It is probable that this troublesome expression owes its existence and persistence in our law of evidence to an inclination of judges and lawyers to avoid the toilsome exertion of exact analysis and precise thinking. Certain it is that since its introduction at the close of the eighteenth century, on account of its exasperating indefiniteness it has done nothing but bewilder and perplex."

Thus chastened, we will resist the temptation to mutter the shibboleth "res gestae." The splendid utility of the maligned phrase, of course, arose from the fact that it referred to a blurred boundary, the misty border zone between instances of the hearsay rule inapplicable and instances of the hearsay rule satisfied.[3] Sometimes a statement was admissible because it was non-hearsay (the hearsay rule inapplicable); sometimes a statement was admissible even as hearsay because it satisfied one of the recognized exceptions to the hearsay rule (the hearsay rule satisfied); sometimes a statement was admissible because it somehow partook of both theories; sometimes the shibboleth was an easy way for a practical-minded court to say, "We frankly can't figure out whether the statement is admissible under Theory A or Theory B, but we don't really care because it is admissible in either event."

As we begin our effort to pin down the phantom concept, we observe that the fact that the words on the note were written rather than spoken is of no significance. That a message was sent and was received is the thing of significance, not the medium of the message. If an eavesdropper had overheard the very message that was contained in the note and had testified to that fact in court, the analysis that follows would not be different.

One reason for the admissibility of the note, we hold, is that it was a physical part of the *corpus delicti* of the crime itself. As such, it is non-hearsay and does not depend for its admissibility upon the truth of anything asserted in the note. The escape in this case was not a single, spontaneous leap over the wall. The physical action of the escape itself can be parsed into a series of component actions: (1) the placing of Gray's name on Hatfield's visitor list; (2) the passage of Gray down into the Segregated Visiting Area; (3) a communication to Frances Robinson that it was time for her to move into the General Visiting Area; (4) a communication

---

**3.** The phraseology is that of Professor John S. Strahorn, Jr. in his *A Reconsideration of the Hearsay Rule and Admissions,* 85 Pa. L.Rev. 484, 564 (1937).

to the escapee Everett that Gray was inside with Hatfield and that Frances Robinson was on her way in; (5) the passage of the escapee Everett up to the General Visiting Area; (6) the assumption on the part of Everett of the role of the visiting Gray; and (7) the ultimate movement of Everett out the door with the word "HALT" stamped upon his hand. If Everett, with no thought of escape, had simply and negligently been allowed to walk out the door unmolested, there might be some question as to the establishment of the *corpus delicti* not present under the facts of this more sinister escape. Since the establishment of the undergirding crime is a prerequisite to the establishment that someone else, such as the appellant, in some fashion aided or abetted the principal in the first degree, the proof of the *corpus delicti,* in all of its component parts, was a necessary part of the State's case. The note was the proof of one of those components.

In that capacity, the note was clearly non-hearsay. It was the observable act of signaling the escapee that all pieces were in place and that it was time to move up and out. This act of signaling would be admissible in its own right whether the arranged signal had been three short bleeps followed by one long blast of the whistle of a neighboring industrial plant; the inexplicable blaring forth on the prison public address system of the orchestral refrain from "Born Free"; the sudden appearance of a prison confederate at the door of the tier shouting, "Go, Man, go!"; or, as in this case, the communication of precisely that same signal via the mechanism of the note in question. The very giving of the signal had its own relevance and thereby justified its admissibility. This variety of non-hearsay was one of the myriad notions subsumed within the umbrella term "res gestae."

The admissibility of the fact of the signal itself did not depend upon the truth of the matters presumably asserted by the signal. It was the very giving of the signal that had relevance, not the form that it took. If the content of the signal had been mistaken or otherwise false, the signal itself could still have had its independent relevance at the trial of Everett for an attempted escape that failed or at the trial of

Everett, Hatfield, Robinson, and Gray for a completed conspiracy, regardless of whether the object of the conspiracy was successfully consummated or not.

We hold that the note in question was also admissible in this case under a closely-related theory of non-hearsay, that which Wigmore characterizes at § 1788, p. 234-235, as "Utterances used as Circumstantial Evidence." At issue is the state of mind of a particular person — in our case, the escapee Everett. In § 1790, Dean Wigmore discusses the relevance of the words spoken (or, presumably, written) by a person as evidencing that person's state of mind circumstantially. In § 1789, Dean Wigmore discusses the relevance of the words heard (or, presumably, read) by a person as evidencing that person's state of mind circumstantially. He pointed out, at p. 235:

> "Wherever an utterance is offered as evidence of the *state of mind* which ensued *in another person* in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the Hearsay rule is concerned." (Emphasis in original.)

The state of mind of the escapee Everett was a relevant issue in this case in at least three regards. His awareness of precisely what had transpired or was about to transpire along the complex escape route helped to explain what would otherwise have appeared to the jury to be bizarre or inexplicable behavior on his part. Why would a prisoner, to receive a visitor, abandon his shirt in a stairwell? Why would a prisoner, to receive a visitor, have the word "HALT" printed on his hand in invisible ink? Why would a prisoner, on his way to the visiting room, assume the role of someone else who was visiting someone else? The state of mind of Everett was also highly relevant in establishing his own criminal complicity, a necessary predicate to establishing the subsidiary complicity of another who somehow aided and abetted him. With respect to that aiding and abetting, an

innocent act which by blind chance somehow benefits a criminal is not a criminal act. It helps to establish the crime of aiding and abetting to prove that somehow there is communicated to the person who is to be aided and abetted the knowledge that the criminal aid and assistance is then being or is about to be rendered. Everett's awareness that he was being aided and abetted by others was a necessary ingredient in the aiding and abetting. In all three of these subrespects, Everett's state of mind was highly relevant. With respect to that state of mind, the fact that he received the message contained in the note is the thing that was significant, not the truth of the things asserted by the message.

The note recited, "Ed [Edward Gray] went in to Hat [Charles Hatfield] two minutes ago." The significance of the message was not to prove that Edward Gray was in fact then visiting Charles Hatfield but to prove that the escapee Everett was somehow told that Edward Gray was then visiting Charles Hatfield and that his resultant state of mind spurred him into action. The message also recited that "Fran [Frances Robinson] came back to the window" and was told to hurry. The significance of the message was not to prove that Frances Robinson had in fact received a message, through the prison window, to hurry but to prove that the escapee Everett was somehow told of this fact and that his resultant state of mind spurred him into action.[4]

The importance of the message was not that the assertions in the message were true; the importance was that the escapee Everett received the message and that the message had significance for him. This variety of non-hearsay was also one of the myriad notions subsumed within the umbrella term "res gestae."

The note was, we hold, admissible under yet a third theory, this time not as non-hearsay but as a recognized excep-

---

4. The truth of the things asserted in the note was virtually beyond dispute in this case. The prison records showed that Edward Gray visited Charles Hatfield. Hatfield, moreover, testified to this effect and Gray did not deny it. The prison records showed that Frances Robinson shortly thereafter initiated her ultimately aborted visit to Everett.

tion to the rule against hearsay. It is well settled that the declarations of a co-conspirator, made during the operative life of the conspiracy and in furtherance of the conspiratorial purpose, are admissible in evidence against other members of that conspiracy. *Bloomer v. State,* 48 Md. 521 (1878); *Lawrence v. State,* 103 Md. 17, 63 A. 96 (1906). The escape in this case was the clear result of widespread and well-planned conspiracy, involving not only the escapee Everett, the segregated prisoner Hatfield, the appellant Gray, and his former codefendant Robinson but other necessary cogs in the total machine whose names are not known and may never be known. One of those other persons, indisputably, was the author of the note who, directly or indirectly, received word that the appellant Gray was down inside the visiting room for segregated prisoners and that Frances Robinson was on her way into the general visiting room. That unknown co-conspirator sent the signal to the escapee Everett, through the medium of the note, that everything was in place and that it was time for him to put his part of the scheme into execution. It is to state the obvious to point out that the note was authored and delivered while the conspiracy was still in full operation and that its delivery was in direct furtherance of the exclusive object of the conspiracy. As such, the declarations of that unknown but undisputed co-conspirator were admissible against all other co-conspirators, including the appellant Edward Gray. This variety of exception to the hearsay rule was also one of the myriad notions subsumed within the umbrella term "res gestae." Wigmore, § 1769.

Wistfully, we think back to a simpler day when it would have been so easy to hold in untroubled innocence that the note in this case was admissible because it was a part of the "res gestae." R.I.P.

*Judgment affirmed; costs to be paid*
*by appellant.*