488 A.2d 195

**John Edward BOOTH aka Marvin Curtis Booth**

v.

**STATE of Maryland.**

**No. 773, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

Feb. 19, 1985.

Certiorari Granted June 11, 1985.

**28**

Robert L. Pierson, Assigned Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on the brief), for appellant.

Valerie J. Smith, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Kurt L. Schmoke, State's Atty. for Baltimore City, Timothy J. Doory and Reid Rubin, Asst. State's Attys. for Baltimore City, Baltimore, on the brief), for appellee.

Argued before BISHOP, ADKINS and GETTY, JJ.

BISHOP, Judge.

A Baltimore City Circuit Court jury convicted appellant, John Edward Booth, of first degree murder [1] and robbery with a dangerous and deadly weapon.[2] The court (Greenfield, J.) sentenced appellant to life imprisonment for the murder conviction and twenty years for the conviction of robbery. The sentences were directed to run consecutively.

---

1. Md.Ann.Code 1957, art. 27, § 407 (1984 Repl.Vol.)

2. Article 27, § 488.

## FACTS

On Monday, April 5, 1983, the day after Easter, Officer Wilson of the Baltimore City Police Department discovered the dead body of James Edward ["Pie"] Ross in the dining room of Ross' home. Ross' shirt was stained with blood and his pants pockets were turned inside out. The victim's wallet was found under the dining room table. There were no signs of forced entry and the room was neat except for an overturned chair and a sideboard which had been moved away from the wall. Ross, who had been stabbed twenty-two times, had been dead approximately twenty-four hours. An extensive investigation ensued, which lead to the arrest of appellant.

At trial, the State adduced evidence showing that on Easter Sunday, April 4, 1983, Regina Harrison telephoned the victim between 5:30 and 6:00 p.m. He told her he had company, a young girl named Brenda, whom he intended to ask to leave, because he was getting ready to prepare dinner for some other guests he was expecting later that evening. Harrison testified that during the telephone conversation she heard a door open and then a man and a woman talking. Being familiar with the apartment, she surmised that the voices were coming from the front steps outside the vestibule door. According to Harrison, the victim did not seem anxious or nervous during the telephone conversation. This same information had been related to the police during the investigation.

Veronda Mazyck testified that in late March or early April, 1983, appellant and a woman named Brenda came to live with her and her boyfriend. The four spent the Saturday evening before Easter getting high on heroin and discussing their need for money. Mazyck testified that the next morning, appellant was constantly saying that he wished he could get some money so they could obtain more drugs. Brenda stated that she knew a place they could go. As it was getting dark, appellant and Brenda left the apartment.

Mazyck testified that when appellant and Brenda returned at about 9:00 p.m., the front of appellant's jacket was bloody. From his sleeve he pulled a yellow shopping bag which contained an eight inch long butcher knife. Mazyck identified the knife as one of her own. According to the witness, appellant was anxious and asked Mazyck's boyfriend to help him get out of the bloody jacket. The two men went into the bathroom. Mazyck heard water running in the tub. Mazyck further testified that during this time Brenda was seated in a chair in the bedroom and was in an hysterical condition.

When appellant and Mazyck's boyfriend entered the bedroom, appellant was no longer wearing his jacket. He showed the others a roll of cash which he was peeling and counting. Mazyck estimated that there were more than fifty dollars. Appellant said that he and Brenda had gone to the house of someone Brenda knew, that Brenda had knocked and was let in while appellant stood on the side. A little later Brenda let appellant into the house. According to appellant, Brenda was supposed to get money from the man so they could get high, but it did not turn out as it was supposed to and he had to "put the mash to the man." As he said this, appellant had his right hand raised and was moving it back and forth which indicated to Mazyck that appellant had stabbed the man. Later that evening, when Brenda said she wanted to watch the news to determine if the man was all right appellant told her, "you know what dead is."

Charles Westry, who lived with appellant's sister, testified that one night, while he was alone with appellant, appellant told him that Brenda had gotten panicky in a situation involving a murder. According to Westry's narration of appellant's statement, Brenda had "set up her uncle or something to take him off" for some dope and that when Brenda panicked, appellant had to kill him. Appellant stated that he stabbed the man and showed Westry how, by moving his hand up and down. When appellant said that he wanted to kill Brenda because he was afraid she would go

to the police, Westry told him he wanted nothing to do with it.

In his defense, appellant called several members of his family, each of whom testified that appellant was home with them all of Easter weekend.

After being instructed on the elements of premeditated murder, felony murder[3] and robbery, the jury convicted appellant of armed robbery and premeditated murder.

Appellant raises two issues:

I. The trial court erred in permitting into evidence the hearsay statement of the victim.

II. The trial court committed plain error by failing to instruct the jury on second degree murder and by giving the jury a verdict sheet which did not contain second degree murder as one of the possible verdicts.

## I.

### *Hearsay Evidence*

Appellant objected to the testimony of Regina Harrison in which she related her telephone conversation with the victim during which the victim had stated that a young girl named Brenda was at his apartment. Appellant also objected to the content of Harrison's conversation with the victim coming in through a police witness who questioned her during the homicide investigation. The ground of each objection was that the victim's statement to Harrison about Brenda was inadmissible hearsay which did not fall into any recognized exception. After a hearing *in limine* on the admissibility of Harrison's testimony, the court, in a well reasoned oral opinion, ruled that the victim's statement was admissible through Harrison under the "present sense impression" exception to the hearsay rule. The trial judge noted, and we agree, that no Maryland case has expressly

---

**3.** Article 27, § 410.

adopted this hearsay exception. Appellant urges that we decline to do so now, at least on the facts here presented.

■ Federal Rule of Evidence 803(1) defines present sense impression as

A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter.

Thus, the declaration must be contemporaneous with the event.

The now much discredited term "res gestae", *Gray v. State*, 53 Md.App. 699, 710–716, 456 A.2d 1290 (1983) was typically used to

justify the admissibility of statements which today come within the four [hearsay] exceptions [encompassed by the category 'spontaneous statements.']:

(1) statements of present bodily condition, (2) statements of present mental states and emotions, (3) excited utterances, and (4) statements of present sense impressions. Despite the increased sophistication of the hearsay rule and its exceptions today, however, courts still occasionally speak in terms of *res gestae* rather than in terms of more precise hearsay doctrine.

McCormick, *Evidence*, § 288 (3d. ed. 1984) (footnote omitted); *Wabisky v. D.C. Transit System, Inc.*, 309 F.2d 317, 318 (D.C.Cir.1962). *See also, Moore v. State*, 26 Md.App. 556, 560, n. 1, 338 A.2d 344, *cert. denied*, 276 Md. 747 (1975) where we stated that *res gestae* was an

umbrella term [which] covers a wide variety of analytically distinct rationales, including excited utterances; declarations of both present bodily condition and present mental condition ...; declarations of present sense impression ...; admissions by a party or declarations against interest...."

We agree with McCormick, *supra*, at § 298, that the present sense impression compares favorably with the excited utterance exception to the hearsay rule. McCormick wrote:

Given the danger of unreliability caused by the very emotional excitement required for excited utterances, it makes little sense to admit them while excluding other out-of-court statements which may have equal assurances of reliability and lack of inherent defects of excited utterances.

*Id.* p. 860 (footnote omitted).

Also, in the past, our Courts have upheld, under the "res gestae" or excited utterance exceptions to the hearsay rule, statements which more closely resembled declarations of present sense impression. *See, e.g., Grier v. Rosenberg,* 213 Md. 248, 256, 131 A.2d 737 (1957) (statement to person injured in auto accident "I have the car number" held admissible as part of res gestae); *Hall v. State,* 5 Md.App. 599, 249 A.2d 217 (1969) (testimony that, during sexual attack, an unidentified person inquired "who's on him now?" and that another unidentified person replied that "Billy Hall" was on the victim, held admissible as part of *res gestae* ).

In *Gray v. State,* 53 Md.App. 699, 710–711, 456 A.2d 1290 (1983), Judge Moylan for this Court observed that

[o]ne almost longs nostalgically for the discredited label of 'res gestae', notwithstanding its utter repudiation in polite academic circles. Its sin was its elusive ambiguity.

We avoid the shotgun approach of *res gestae* and instead we attempt to focus our approach in this case. As we noted in *Moore,* "Maryland has firmly endorsed the principle of the 'excited utterance' exception to the hearsay rule." *Id.,* at 566 (citations omitted). In *Moore, supra,* Judge Moylan in an excellent discussion of "Excited Utterances as an Exception to the Hearsay Rule" quoted from Morgan, *A Suggested Classification of Utterances Admissible as Res Gestae,* 31 Yale L.J. 229, 238 (1922). In that article Professor Morgan pointed out:

In this country but few cases prior to 1880 gave weight directly to the element of spontaneity, and fewer still to the fact that spontaneity was insured by the startling

nature of the event. Indeed contemporaneousness rather than spontaneity was emphasized, although the latter was clearly recognized as highly important.

*Id.* p. 563, 338 A.2d 344.

In *Moore,* we also pointed out that McCormick in his first edition, 1954 at § 272 "Excited Utterances (Spontaneous Exclamations)" pp. 578–579, 338 A.2d 344 stated:

Psychologists would probably concede that excitement stills the voice of reflective self-interest but they might question whether this factor of reliability is not over-borne by the distorting effect which shock and excitement have upon observation and judgment. But they might well conclude that contemporaneous statements both ex-cited and unexcited are so valuable for the accurate reconstruction of the facts that the need is not to narrow the use of excited statements but to widen the exception to embrace as well unexcited declarations of observers near the time of the happening.

At page 862 McCormick's third edition, he further ex-plains:

In addition to the absence of any requirement of an exciting event, the hearsay exception for statements of present sense impressions differs from the exception for excited utterances in two other significant respects. First, while excited utterances need only 'relate' to the startling event or condition, present sense impressions are confined to 'describing or explaining' the event or condition perceived. This limitation is consistent with the theory underlying the present sense impression exception, that fabrication and forgetfulness are precluded by the absence of time lapse between perception and utterance. Second, while the time within which an excited utterance may be made. is measured by the duration of the stress caused by the exciting event, the present sense impres-sion statement may be made only while declarant was actually 'perceiving' the event or 'immediately thereafter.' This shortened period is also consistent with the theory of

the present sense impression exception. While principle might seem to call for a limitation to exact contemporaneity, some allowance must be made for the time needed for translating observation into speech. The appropriate inquiry is whether sufficient time elapsed to have permitted reflective thought.

As we noted in *Moore:*

Two factors combine to permit the admission of certain classes of hearsay—1) necessity and 2) the circumstantial probability of trustworthiness. In the case of spontaneous declarations generally, there is no requirement that the declarant be unavailable.

26 Md.App. at 562, 338 A.2d 344. *See also,* F.R.E.E. 803 (availability of declarant immaterial). Appellant does not deny that Harrison's testimony as to the statement of the victim was necessary evidence. Rather, appellant contends that the statement of the deceased victim as a present sense impression does not carry sufficient indicia of trustworthiness. In further comparing excited utterances to "unexcited statements of present sense impressions" McCormick states

Although these statements [of present sense impression] lack whatever assurance of reliability there is in the effect of an exciting event, other factors offer safeguards. First, since the report concerns observations being made at the time of the statement it is safe from any error caused by a defect of declarant's memory. Second, a requirement that the statement be made contemporaneously with the observation means that there will be little or no time for calculated misstatement. Third, the statement will usually have been made to a third person (the witness who subsequently testifies to it) who, being present at the time and scene of the observation, will probably have an opportunity to observe the situation himself and thus provide a check on the accuracy of the declarant's statement, i.e. furnish corroboration. Moreover, since the declarant himself will often be avail-

able for cross-examination, his credibility will be subject to substantial verification before the trier of fact. McCormick, *supra,* § 298, p. 860–1.

■ Appellant, conceding that the first two factors are satisfied, argues that the third and fourth factors are not. As to the third factor, appellant notes that Harrison was not present at the scene of the victim's statement that a young girl named Brenda was there with him, and thus could not check the statement's accuracy. The trial judge found, and we agree, that since Harrison could hear a woman's voice through the telephone, there was sufficient corroboration. Clearly, Harrison's testimony verified that a woman was indeed present at the victim's home. The fact that Harrison could not identify the person as Brenda, goes to the weight of the corroborative evidence, not to its admissibility.

Finally, as to the fourth factor, appellant asserts, quite correctly, that the declarant was unavailable for cross-examination. As previously noted, under the Federal Rules the availability of the declarant is immaterial. While the declarant's availability for cross-examination is a helpful check on the accuracy of a statement, unavailability, just as often, either creates or compounds the need for the hearsay evidence in the first instance. We also note that Harrison was available for cross-examination as to her credibility and the accuracy of her narration.

■ In the case *sub judice,* the trial judge found the victim's statement to be spontaneous and reliable.

[T]he trial judge has the duty to consider the circumstances under which the declarations were made and to determine (largely in his discretion) whether they were uttered spontaneously or designedly with a view to making evidence.

*Moore v. State,* 26 Md.App. at 567, 338 A.2d 344 (quoting McCormick, *Law of Evidence,* (1st ed. 1954) at 562). As in *Moore,* we find no abuse of discretion "in concluding that the declaration in issue was surrounded by substantial

guarantees of trustworthiness... Under those circumstances, it was clearly admissible." 26 Md.App. at 566, 338 A.2d 344.

■ Finally, appellant asserts that the police witness' testimony relating his conversation with Harrison in which she relayed the hearsay statement of the victim, was also inadmissible hearsay. We disagree. The record indicates that Detective Corbin's narration of his meeting with Harrison was not offered for its truth, but merely to show the information upon which he acted in later showing Harrison a photo array containing a picture of Brenda. Even if we assume the testimony was offered for its truth, and erroneously admitted, the testimony was entirely cumulative to Harrison's prior admissible testimony. Any error would be harmless beyond a reasonable doubt. *Dorsey v. State*, 276 Md. 638, 350 A. 665 (1976).

## II.

### *Jury Instructions*

Appellant contends that the trial court committed plain error in failing to instruct the jury on the elements of second degree murder and by failing to include second degree murder on the verdict sheet as a possible verdict.

Appellant did not object to the instructions or the verdict sheet and failed to request any action by the lower court and thereby failed to comply with the ordinary prerequisites to obtaining appellate review. Former M.R.P. 757f.[4]

Appellant urges us to exercise our discretion to "take cognizance of and correct any plain error in the instructions, material to the rights of the defendant even though the error was not objected to...." Former Rule 757h. For the reasons that follow we decline to do so.

■ Appellant was charged with first degree murder. "The general rule is that where there is no evidence supporting conviction of a lesser degree of homicide, no instruc-

---

**4.** New Rule 4–325.

tions on lesser offenses should be given." *Blackwell v. State,* 278 Md. 466, 477, 365 A.2d 545 (1976); *See generally, annot.,* 102 A.L.R. 1019 (1936). In the case *sub judice,* evidence supported a finding that appellant left the home of Veronda Mazyck with the express intent of robbing the victim of either drugs or money. Appellant admitted that when the plan went sour he stabbed the victim. The victim died after being stabbed twenty-two times. There was circumstantial evidence that the victim was robbed. Appellant returned to Ms. Mazyck's with at least $50 in cash. Where, as here, the evidence amply supported a verdict of guilty of either felony murder or premeditated murder, we do not think the trial court was required to instruct on second degree murder in the absence of a timely request by defense counsel. *See, Thomas v. State,* 206 Md. 575, 112 A.2d 913 (1955); *Chisley v. State,* 202 Md. 87, 95 A.2d 577 (1953).

■ We also take this opportunity to reiterate that the decision whether to review and correct plain error in instructions, even when the error is material to the rights of the accused, is purely within the discretion of the appellate court. *Squire v. State,* 32 Md.App. 307, 309, 360 A.2d 443 (1976) *rev'd on other grounds* 280 Md. 132, 368 A.2d 1019 (1977); *Brown v. State,* 14 Md.App. 415, 418, 287 A.2d 62 (1972). *See also, Sine v. State,* 40 Md.App. 628, 632, 394 A.2d 1206, *cert. denied,* 284 Md. 748 (1978) (discretion conferred by Rule 757h will not be exercised as a matter of course, even where the error complained of is clear.) In *State v. Hutchinson,* 287 Md. 198, 411 A.2d 1035 (1980) the Court explained:

> While we do not propose to set forth any fixed formula for determining when discretion should be exercised, we do expect that the appellate court would review the materiality of the error in the context in which it arose, *giving due regard to whether the error was purely technical, the product of conscious design or trial tactics or the result of bald inattention.* We enumerate these factors because we feel they are ordinarily incon-

sistent with circumstances justifying an appellate court's intervention under § h. In our cases we have characterized instances when an appellate court should take cognizance of unobjected to error as *compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial.*

*Id.* at 202–3, 411 A.2d 1035. (emphasis added). The defense did not raise any issue at trial regarding the degree of homicide. Rather, the theory of appellant's defense was alibi. At the conclusion of instructions, defense counsel expressly stated that he had no objections. We are compelled to conclude under these circumstances that appellant's failure to draw attention to the error below was the product of either "conscious design or trial tactics or the result of bald inattention." *Id.* Consequently, appellant fails to present us with such "compelling, extraordinary or exceptional" circumstances justifying the exercise of our discretion under former Rule 757h, even if we were to conclude that the jury instructions were deficient.[5]

JUDGMENT AFFIRMED;
COSTS TO BE PAID BY APPELLANT.

---

5. For an excellent discussion on the Hutchinson case and the problem of "plain error," see Note, 10 U.Balt.L.Rev. 362 (1981).