473 A.2d 1315

**Timothy Joseph BUZBEE**

v.

**STATE of Maryland.**

**No. 986, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

April 16, 1984.

600

Reginald W. Bours, III, Rockville, with whom were John C. Monahan, Teresa Whalen and Bours & Monahan, Rockville, on brief, for appellant.

Carmina Szunyog, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Andrew L. Sonner, State's Atty. for Montgomery County and Barry Hamilton, Asst. State's Atty. for Montgomery County on brief, for appellee.

Argued before LOWE, WEANT and BISHOP, JJ.

LOWE, Judge.

This case points out the patience, perception, persistence, participation and perspicacity required to catch a rapist. It also shows how the pieces of evidence patiently gathered, while when viewed in isolation may be meaningless, when perspectively placed in a collage constituting a significant

whole, may justify by their combined effect an irrefutable conclusion.

For two years or more an ever growing number of young girls were preyed upon by a warped debauchee in a substantial neighborhood of Montgomery County. Although the investigative composite of crimes is relevant to the probable cause for a warrant ultimately sought upon the apprehension of appellant, the circumstantially proven conviction in the Circuit Court for Montgomery County from which this appeal was taken dealt with the kidnap-rape of a fifteen-year-old girl abducted from her home on July 31, 1981.

By mid-1982 the Montgomery County newspapers were headlining the ominously frequent assaults by the "Aspen Hill Rapist". A pattern of sexual assaults since the preceding year gave rise to the suspicion that it was but one individual responsible for up to sixteen rapes in a residential area indigenously recognized in the County vernacular as "Aspen Hill". As victim after victim recited the frightening and humiliating details of their encounters, bit by bit a physical as well as psychological profile fell in place.

Physically, the assailant appeared to be a white male in his early twenties, approximately 5'9" tall, weighing in the vicinity of 160 to 180 lbs. His conversation with his victims revealed a distinctive speech pattern described variously as a rasp; a husky almost lisp. He had dark brown hair, probably a moustache, and was seldom clean shaven in the evening hours when the rapes occurred. Physical contact with his victims revealed substantial body hair. He wore glasses, dark work-type pants, gloves, usually a ski mask and work-type shoes or dock siders. His transportation varied between a small silver foreign make car or a two-tone van. Frequently he was armed, exhibiting a handgun as a threat to his victims.

Apparently aware of when the young girls he attacked would be home alone in the evenings, he would enter their homes, accost them from behind and blindfold them before

there was an opportunity to identify him. Indications showed rather certainly that he had staked out the residences, knew the family habits, the residential layout and the neighborhoods as well. His knowledge of the surroundings and victim's habits was as significant to the police as it was ominous to his victims and the public.

While he usually blindfolded and gagged the victims when taking them to nearby areas where he committed his assaults, he was less sadistic than depraved. He sought satisfaction not by seeing his victims physically harmed as much as by forcing upon them his debauchery. In addition to committing the act of intercourse itself, he frequently kissed and fondled his victims and performed cunnilingus upon them, demanding comparable attention in return. Psychologically he seemed to see himself more the Lothario than a Jack-the-Ripper. Not infrequently it appeared that he would steal from his victims available money and occasionally lingerie. On one occasion he stole a gasoline credit card which was used on nine later occasions. More often he appeared to steal what appeared readily available in the residence or on the victim's person, as incident to his primary sexual motivation rather than vice versa.

After diligently and patiently patching together pieces of the puzzle, a profile began to take shape. Coincidence, coupled with police perception, began to fill in the missing pieces. An investigating officer learned that an officer at the Montgomery County Police Academy and his metropolitan police officer brother had a mutual friend who "came to mind" when they read newspaper stories about the Aspen Hill rapist. A former schoolmate named Timothy Buzbee from the Aspen Hill area fit the general description. He was a white male, 25 years of age, the approximate size described, with a moustache, heavy "five o'clock shadow", distinctive "soft and raspy" voice and had worn glasses before getting contact lens. Buzbee had not only lived in the Aspen Hill area but with his father operated a surveying company doing residences and residential sites in that area and in metropolitan Washington. He owned a silver

Toyota but had access through the company to a brown and tan van. In his work he usually wore jeans or dark pants, construction type shoes, gloves and, in winter, ski hats. The metropolitan police brother who had worked with Buzbee related that Buzbee frequently looked in the residences where he was surveying and once had started to enter one of the houses. He also described an incident of Buzbee's inordinate attention to, and knowledge concerning, a particular young lady who was known to, but not by, Buzbee.

Such coincident particulars were sufficient to surmise a possibility but hardly enough seriously to suspect an otherwise reputable young family man. The police, however, recalled an incident nearly two years earlier when a reported assault of a young woman was interrupted and two men acting as good samaritans chased but lost the assailant who was dressed in dark pants and jacket. They later came upon a "jogger" dressed in a white oxford shirt, dark trousers and work shoes but the victim was not sufficiently certain to identify him positively. She was reinterviewed as to details in 1982 because the "jogger" in the work shoes and white shirt was Timothy Buzbee.

Another friend of Buzbee's, who was with the FBI, was located through the metropolitan police officer and his brother. He supplied details of Buzbee's character and habits which revealed an inordinate preoccupation and attention to young girls' anatomies and the likelihood that he was at the very least a "peeping tom" who spent substantial time and effort viewing subjects of interest. By details pieced together from these "friends", he was descriptively categorized as oversexed.

The police then interviewed a secretary of the surveying firm with which Buzbee was affiliated. She happened to have been the wife of a county K–9 policeman who was occasionally called regarding the Aspen Hill rapes. When she was first employed Buzbee had "grabbed" her but released her when she threatened to scream. She described Buzbee as 5'8 to 5'9, medium build, with a distinctive lisp or

hair lip type speech peculiarity, generally clean but frequently unshaved. He primarily operated one of two vehicles during his work: his own silver Toyota or his father's brown and white van.

She related an incident occurring in the spring of 1982 when, having occasion to enter Buzbee's desk, she noted a black zipper locked bank bag not theretofore observed. Finding a key in another drawer, she opened the bag and found six to ten pairs of ladies underwear of assorted styles, colors and sizes. After relocking and returning it to the desk, she observed from time to time thereafter that the bag appeared to be thicker although she never reopened it. In July it disappeared.

She also took note of the interest Buzbee had regarding her husband's work as it related to the Aspen Hill rapist. He inquired a number of times whether any suspects had been developed and was equally interested in the tracking abilities of the canines handled by the secretary's husband.

In the meanwhile, writing samples were taken from the receipt slips obtained from one of the rape victim's gasoline credit cards that had been stolen and used. These writing samples were matched by the Federal Bureau of Investigation against known writing samples of Buzbee. The result was that Buzbee should not be eliminated as a possible suspect in the writing of the signatures.

What had begun as a remotely hopeful tip based on coincident characteristics, developed into serious suspicion warranting surveillance. Such surveillance found Buzbee in a neighborhood where he parked and walked into the darkness toward the back yard of a residence. Noises were heard by the officers in the area but darkness obscured the actions causing the rustlings until a white male jumped the fences of the back yard and ran back to the van previously seen parked by Buzbee.

Investigation revealed that in the house behind which Buzbee appeared to have been "peeping" was a young teenager alone, until her father's return stimulated Buz-

bee's departure. The officers found that pry marks were on locking devices of sliding doors and the door closest to the girl was open about three inches.

While suspicion thus turned to likelihood, the police believed more was necessary to establish probable cause for obtaining from Buzbee blood, saliva, and various hair samples to be matched against similar samples obtained from the various rape victims, and to search the silver Toyota which was the vehicle more frequently seen.

The police therefore contacted a victim of some fifteen months earlier who had been exposed to substantial conversation with the rapist and felt certain she could identify his voice due to its peculiar intonation. The police then selected a list of land surveyors in the area and called each with a similar fictitious survey problem permitting the victim to listen on an extension. During the fifth call, the victim exclaimed that she was "pretty sure" that the male speaking was the voice of the man who assaulted her, but she wished to see him in person to be absolutely sure. The man who was speaking at that time was verified by his secretary as being Timothy Buzbee.

A search warrant was issued on an affidavit setting forth in detail all that we have summarized and more. The evidence was seized; Buzbee was arrested, indicted, tried and convicted of first degree rape, first degree sexual offense, kidnapping and burglary of a fifteen-year-old victim whom we shall identify by a pseudonym—Debra Day.

Because there had not been an opportunity for a positive eyewitness identification the case was tried, as the investigation had been conducted, on circumstantial evidence. Debra, who was barely fifteen years old at the time, had been home alone. She was grabbed from behind, taken to her room where two pairs of socks were tied together forming a blindfold and a gag. The blindfold permitted her to see only a small triangular space where her nose caused a small space to be uncovered as the blindfold crossed her cheekbone. She was then taken out her back door, walked to a

strange car and transported to another residence into which she was taken by the assailant who had a key thereto. She was taken to a bedroom and forced to undress, as did her assailant.

Out of concern for the victim's embarrassment at having to testify before an overflow crowd at a highly publicized and media covered trial, the victim was permitted to write rather than state what then occurred. She wrote.

"He got on top of me and touched me all over and then kissed me in the vagina, he asked me to touch him and I said, 'no', he then had intercourse with me.

Debra was then taken to the bathroom "to clean up", after which she was taken to her home and released at her back yard.

Debra traced for police, and at trial, the approximate route she had been taken by recalling turns, road sounds, etc. She also described the surface of the route over which she walked when led to the door which appellant unlocked with his key.

■ The route pieced together by the police pursuant to her description coincided with the location of a house owned by Timothy Buzbee's parents. Debra also described what little she could see of the interior, floor entrance way, stairs, bed and bathroom. The description was not unlike the interior of the elder Buzbees' home, although appellant relied heavily upon proven variances.

These pieces of evidence, each by itself insufficient to establish appellant's criminal agency, together constituted a significant whole portrait, colored with legitimate inferences justifying the conclusion that Timothy Joseph Buzbee was Debra's rapist. Other circumstantial evidence included the voice identification by Debra Day and expert testimony that hair samples found upon the victim's clothing probably originated from appellant although admittedly,

"hairs do not possess enough individual microscopic characteristics to be positively identified as originating from a particular person to the exclusion of all others."

Those, added to appellant's appearance as described by the victim, his car, his ready access to his family home along with the family home descriptions, constituted most of the circumstantial evidence from which inferences were available. The combined effect of this evidence pointed conclusively to Buzbee's criminal agency; however, appellant himself added an additional inculpating circumstance.

Upon arrest appellant was given *Miranda* [1] warnings and after consulting his lawyer-father by 'phone declined to give any statement to the police. No interrogation followed that refusal; however, after being told that search warrants were being issued for his home, appellant was permitted to call and apprise his wife. During the conversation which he held within earshot of the police, he informed her that he had been arrested for the "Aspen Hill rapes". Appellant had assumed, but had not been informed, of that reason for his arrest. As a consequence, the State offered the statement to show appellant's state of mind. Obviously the State was not concerned with proving the truth or falsity of that utterance, but only with the fact that it was uttered. Because the purpose for which the statement was admitted had nothing to do with its truthfulness or falsity, or nothing to do with the criminal character of accused, appellant's attempt to misdirect us toward an "evidence of other crimes" argument is unavailing. That appellant's blurt indicated his belief that his arrest was for more than one such rape is of no consequence because whether that was true or not is of little significance. Any prejudice concerning implied collateral criminal acts is so unlikely as to be of little concern when balanced against the probativeness and need for the evidence. *Cross v. State,* 282 Md. 468, 474, 386 A.2d 757 (1978). Whether this evidence is considered a "verbal act" as in *Borza v. State,* 25 Md.App. 391, 410, 335 A.2d 142 (1975), or an admission showing consciousness of

---

**1.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

guilt as in *Sewell v. State,* 34 Md.App. 691, 694–695, 368 A.2d 1111 (1977), it is nonetheless admissible.

More practically, the out-of-court assertion constituted circumstantial evidence by implication, not of the fact that appellant had been arrested for the Aspen Hill rapes, but of his belief that such purpose underlay his arrest. Appellant's credibility is not important because the relevance of the assertion does not depend upon its truth. For that matter, the inference available from the fact of such an assertion may contradict the truth of that which was asserted.[2] D.F. Bender, *Hearsay Handbook,* § 2.09 (2d ed.)

Appellant's mental state or consciousness of guilt at that time, alone or in combination with the other evidence of his criminal agency, is both material and relevant. Although the truthfulness of the statement was not relevant to appellant's guilt or innocence, his belief without having been so informed was certainly relevant.

We also hold that appellant's assertion of his *Miranda* rights after consulting his father-lawyer has no effect upon this unsolicited remark by telephone to his wife, voluntarily made within the hearing of his captors. The exclusionary rule does not apply to statements obtained without official interrogation directly or indirectly. *Ciriago v. State,* 57 Md.App. 563, 471 A.2d 320 (No. 579, September Term, 1983, filed February 9, 1984).

Appellant also complains that the voice identification made by the victim fifteen months after her rape, when the circumstances ultimately pointed toward appellant, was an inadmissible violation of the Wiretapping and Electronic Surveillance Act, Md.Cts. & Jud.Proc.Code Ann. §§ 10–401 and 10–402(c)(2), presumably because the conversations

---

**2.** An example of such contention may be seen in the reply a bibulous captain placed in the log after an ambitious first mate insisted upon noting therein that on the previous evening the captain had been drunk. Immediately following that entry, the captain entered his own observation that "today, the first mate was sober." The clear implication of that assertion was the contrary of the fact asserted.

with the subjects called were overheard by the victim and were recorded on a tape recorder. Cts. Art., § 10–402(c)(2) reads as follows:

"It is *lawful* under this subtitle for an investigative or law enforcement officer acting in a criminal investigation or any other person acting at the prior direction and under the supervision of an investigative or law enforcement officer *to intercept* a wire or oral communication *in order to provide evidence of* the commission of the offenses of murder, *kidnapping*, gambling, robbery, any felony punishable under the 'Arson and Burning' subheading of Article 27, bribery, extortion, or dealing in controlled dangerous substances, or any conspiracy to commit any of these offenses, where the person is a party to the communication or one of the parties to the communication has given prior consent to the interception." (Emphasis added).

 Considering that appellant was charged with, and convicted of having *kidnapped* Debra Day, his contention is barely arguable, but we will respond. He contends that the exception is intended "to aid in the investigation of a kidnapping in progress or just completed". It will suffice to say that such an absurd implication is completely contrary to the language of the Act. The language is plain and clear and when so should not be impressed with unintended meanings. *State v. Loscomb*, 291 Md. 424, 435 A.2d 764 (1981); *Salzman v. State*, 49 Md.App. 25, 430 A.2d 847 (1981).

 It is also clear that because her identification was not a positive one but only "pretty sure" does not mean that it should not have been admitted. The certainty, or lack thereof, is a question of weight for the jury, not one of admissibility, *Dyson v. State*, 238 Md. 398, 403, 209 A.2d 609 (1965), *vacated and remanded on other grounds*, 383 U.S. 106, 86 S.Ct. 717, 15 L.Ed.2d 617 (1966), unless the uncertainty is tantamount to no identification at all. Certainly, if the Court of Appeals approves the admissibility of

identification by canine scent to be evidence by which a jury may be convinced of criminal agency, *Roberts v. State,* 298 Md. 261, 469 A.2d 442 (1983), a rape victim's statement that she is "pretty sure" that she identified the distinctive voice of her rapist is equally admissible. Voice identification, coupled with other circumstances, is sufficient to support a conviction, *Hall v. State,* 5 Md.App. 599, 609, 249 A.2d 217 (1969), unless done by machine. *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978).

■ Moreover, our review of the procedure does not indicate the slightest suggestiveness in the procedure of including appellant among a number of other surveyors in the area called. The victim was not told that among them was a suspect; although as she responded on examination, any reasonable person would so conclude, otherwise the police would have had her participate in a futile and purposeless exercise.

■ Finally, in this regard we find no validity in appellant's argument that the judge's instructions "unfairly implied that the victim had made an actual identification of Appellant's voice as being that of her assailant." When reviewing the instructions we found the precise opposite. The judge instructed that the "alleged" identification was a disputed issue and pointed out facts by which they might weigh its validity including the degree of certainty expressed by the witness. He followed these specific instructions with the customary reasonable doubt and burden of proof instructions which, if weighted at all, were in favor of appellant's position rather than against it. Even if appellant's instructions were better than those given (which is not the case here), there would have been error only if the court's were wanting.

■ In short then, the evidence of appellant's criminal agency was clearly sufficient to sustain his convictions, notwithstanding that it was primarily circumstantial.

"Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the

main fact may be inferred according to reason and common experience. It is admissible whenever relevant to the determination of guilt or innocence and great latitude is allowed, the court being given a wide discretion in admitting any fact or circumstance which may throw some light upon or serve as a link in a chain of evidence bearing upon the issues at trial. Circumstantial evidence alone is sufficient to support a verdict of guilty (except for the crime of treason and, in some jurisdictions, perjury) or it may be used in conjunction with direct evidence. It may corroborate other testimony and may be used to prove any element of the crime, such as the *corpus delicti* or the criminal agency of the accused.

The law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existence of a fact may be inferred. No greater degree of certainty is required when the evidence is circumstantial than when it is direct, for in either case the trier of fact must be convinced beyond a reasonable doubt of the guilt of the accused. The statements in this paragraph are contained in substance 3 *Wharton's Criminal Evidence* (12th Ed.1955) § 980, pp. 465–77 and I Underhill's *Criminal Evidence* (5th Ed.1956) §§ 15–19, pp 16–29." *Nichols v. State,* 5 Md.App. 340, 350, 247 A.2d 722 (1968) (footnote omitted).

In that regard we are also unimpressed with appellant's contention that, even assuming his criminal agency, the evidence did not disclose sufficient aggravating circumstances to raise the rape and sexual offense crimes to first degree. Again, a short answer will suffice. Both first degree rape, Md.Ann.Code, Art. 27, § 462, and first degree sexual offense, § 464, state that intercourse and sexual acts by force or against the will and without the consent of the other person shall be considered first degree if the victim is placed in fear of death or kidnapping, among other violent acts. In this case the victim was kidnapped and under a threat of its continuation. Furthermore, she testified that she had all but abandoned hope of surviving the ordeal,

which testimony was sufficient to support an inference that she submitted because of fear for her life. See *State v. Rusk*, 289 Md. 230, 424 A.2d 720 (1981).

Appellant's subsidiary argument that the first degree sexual act defined inter alia as cunnilingus, § 461(e), was not proven because the evidence was confined in this regard to the victim's written testimony that appellant had "kissed me in the vagina". Significantly, the victim used the preposition "in" meaning "[w]ithin the confines of; inside", *The American Heritage Dictionary of the English Language*, 663, which leaves little doubt that the proscribed contact was made. Consequently, it could clearly have been inferred by a jury from the brief statement that appellant committed "[a]n act of sex perversion committed with the mouth and the female sexual organ", as cunnilingus is described by *Black's Law Dictionary* 456 (4th ed.)

So much for the sufficiency of the evidence to convict and on to the question of sufficiency of the affidavits to establish probable cause to arrest or seize the evidence subsequently introduced. Appellant's primary complaint seems to be that while most of the evidence recited in the affidavit may have circumstantially inculpated appellant as to other crimes, it was for the most part "irrelevant" to the crime upon Debra Day for which he was tried.

Initially, we point out that an affidavit is not defective because it includes too much evidence or extraneous information. The question is, after discarding the improper surplusage, was enough left to establish probable cause for the warrant's issuance. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In this case, as will be seen, there was. But beyond that even, it should be pointed out that the pattern of evidence in this case relating to other crimes was *not* irrelevant. See McCormick, *Evidence* § 190 at 447 (2d ed. 1972). What really disturbs appellant is that it is too relevant.

**616**

■ To support the arrest or the seizure the affidavit need not be restricted to a single offense. It is just those common characteristics of the assailant as described by his many victims that when added together, pointed toward appellant. Each who had been raped by the similarly described assailant added weight to Debra's description and supported the likelihood that the hair, blood and saliva samples sought would coincide with those obtained from Debra. So too, each verification by the police investigation as included in the affidavit, that appellant was the described rapist increased the likelihood that the evidence sought would be found on or about appellant.

Clearly, affidavits relying as they often do on hastily gathered hearsay need not even necessarily be factually correct, *Franks v. Delaware, supra,* and are not subject to the evidentiary technicalities designed to avoid improper prejudice to a lay jury. They are predicated upon practical, nontechnical conceptions and considerations relied upon daily by reasonable and prudent men. *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Ramia v. State,* 57 Md.App. 654, 471 A.2d 1064 (No. 596, September Term, 1983, filed March 1, 1984). The compilation of evidence bit by bit and victim by victim which led to the focus upon appellant read in the affidavit like an Ellery Queen novel. So pointedly did it indicate appellant as the culprit, it lacked only the customary confession when the culprit was confronted. Indeed, his subsequent subconscious exclamation to his wife may even have fulfilled that final chapter.

■ In passing, appellant argues that the voice identification which particularly identified appellant should not have been considered by the judge who signed the warrant because it was "stale". The only shelf-life suggested by any case to our knowledge regarding the probable cause for a warrant's issuance is the reasonable belief that the item sought remain where it was thought to have been. *Peterson v. State,* 281 Md. 309, 313–314, 379 A.2d 164 (1977); *Andresen v. State,* 24 Md.App. 128, 172, 331 A.2d 78 (1975).

The lapse of time between Debra's rape and her identification of the rapist's voice merely goes to the weight to be afforded the identification.

Relying on *Corens v. State,* 185 Md. 561, 573, 45 A.2d 340 (1946), appellant argues next that the jury should have been permitted to visit his parents' home and view what the State sought to prove was the scene of the rape. He contends that Debra's descriptions from the triangular peep-holes beneath her blindfold did not coincide with the actual appearance of the premises. He further complains that other witnesses describing the premises did not do so accurately.

*Corens* tells us quite clearly that to view or not to view is a discretionary question for the trial judge. See also *Hutchinson v. State,* 36 Md.App. 58, 65, 373 A.2d 50 (1977). Appellant submitted color photographs and descriptions of his parents' home and the judge believed that the issue was sufficiently illuminated by that evidence. To have traipsed through the premises may well have confused the jurors rather than enlightened them. We presume his decision to have been correct, *Mathias v. State,* 284 Md. 22, 28, 394 A.2d 292 (1978), and see nothing in the record of the trial on the motion for new trial to change that view.

Two other issues raised on appeal remain. The first relates to appellant's complaints concerning the State's comment at argument that:

"[T]he defendant, when he was arrested, and charged with rape, this person who is innocent, now you were told by his attorney, he's innocent, didn't want to know when the crime was committed, who the victim was, where the crime was committed; no interest in that. Do you think an innocent person as his attorney just told you, an innocent person confronted with an accusation of that enormity, is just going to sit there, and wonder if he's being taken to the State's Attorney's Office to avoid the media? ... And so that to be confronted with this kind of situation was not normal and it seems like any innocent person, any innocent person would have had some ques-

tion about it, would have had some protestation, would have had something to say about it."

This argument of improper comment on his silence related to evidence admitted without objection regarding appellant's lack of questioning his arrest and presumably also related to his comment to his wife regarding why he had been arrested. The propensity of some prosecutors to overvalue the need for "that last nail" continues to concern us. *Parks v. State*, 47 Md.App. 141, 422 A.2d 384 (1980). Had there not been a failure to object to the evidence initially, the structure the prosecutor sought to reinforce may have been weakened beyond repair. See *Younie v. State*, 272 Md. 233, 322 A.2d 211 (1974). But even if the failure to object to the evidence of silence subsequently commented upon were not sufficient in this case to waive the subsequent comment (but see *Brown and Whitehead v. State*, 57 Md.App. 128, 469 A.2d 462 (1984)), appellant's counsel more clearly did preclude appellate relief after having propitiously objected at argument. He asked to approach the bench but because there was no recording equipment at the time the judge declined. The following day when recording equipment was available, appellant renewed his objection asking the court to permit a brief reply to the State's closing argument and to instruct the jury that appellant had the right to remain silent. He specifically stated that he did not request a mistrial. The judge declined the additional argument but instructed as requested. Since appellant obtained all of the requested relief to which he was entitled, we see no issue remaining to address. Appellant did not ask for a mistrial, conceding at argument that he wanted this jury to decide the case as it had been tried, despite the improper comment. He may not have his cake and eat it too.

■ Finally, appellant complains because the mother and sister of the victim were permitted to testify to some of the consequences suffered by the victim as a result of the rape. But because appellant did not predicate his defense on the corpus delicti, and even conceded that what happened to

Debra was horrible, such testimony was, if inadmissible, harmless beyond a reasonable doubt. When appellant concedes that—

"... we can all feel for her. But the issue in this case is not whether she was victimized, but whether they have charged and are trying the right man."—

it is difficult to see how concern of a mother and sister for the child's sufferings could prejudice the proofs of appellant's agency. In light of all the evidence, we have no difficulty in concluding that the testimony, irrelevant at worst, had no influence on the verdict. *Johnson v. State,* 292 Md. 405, 430, 439 A.2d 542 (1982).

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.