24 A.3d 153

**Timothy Joseph BUZBEE**

v.

**STATE of Maryland.**

**No. 0170, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

July 7, 2011.

Brian M. Saccenti (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for appellant.

Mary Ann Ince (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: WOODWARD, MATRICCIANI and RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

RAYMOND G. THIEME, JR. (Retired, Specially Assigned), J.

On October 15, 2009, a grand jury sitting in the Circuit Court for Montgomery County returned an indictment in ten counts charging Timothy Joseph Buzbee with one count each of common law rape and common law robbery, three counts each of first and second degree rape, and two counts of use of a handgun in the commission of a crime of violence.[1]  In this interlocutory appeal, appellant Buzbee seeks to reverse the order by the Circuit Court for Montgomery County denying his motion to dismiss this indictment.  Buzbee claims that the instant prosecution, which relates to offenses allegedly committed between 1977 and 1980, violates a plea agreement that Buzbee had concluded with the State in 1984 in an unrelated case.  The State responds, first, that this Court lacks jurisdic-

---

1. At the time of the offenses alleged, and in addition to the common law offenses, the first and second-degree rapes constituted violations of Md.Code (1957, 1976 Repl.Vol., 1977–1980 Supp.), Art. 27 §§ 36B(d) (handgun), 462 (first-degree rape) & 463 (second-degree rape).

tion to entertain this appeal, inasmuch as appellant seeks our review of an interlocutory order that does not qualify as an appealable collateral order. In the alternative, the State urges that the prosecution does not violate the plea agreement.

We disagree with the State that we lack appellate jurisdiction over this appeal. We agree, however, with the State's claim that the instant prosecutions do not violate the 1984 plea agreement. We shall therefore affirm the order denying Buzbee's motion to dismiss.

## BACKGROUND

### *The 1982 Prosecutions*

Buzbee was prosecuted in 1982 in connection with a series of rapes that took place in Montgomery County. Although suspected of involvement in 17 or 18 rapes, he was specifically charged with seven rapes that took place between 1980 and 1982.

Buzbee was arrested on November 5, 1982. Attorney Reginald W. Bours, III, was contacted by Buzbee's father and was eventually retained to represent him. The evening of Buzbee's arrest, Mr. Bours, along with his law partner John Monahan, attended a lineup that was conducted at the State's Attorney's office in Rockville. Mr. Bours recalled that none of the potential witnesses were able to identify Buzbee. Three cases did go to trial, resulting in one acquittal and two convictions. Following the first conviction, Buzbee was sentenced to life imprisonment, plus 50 years. The second conviction drew a concurrent life sentence.[2] On June 25, 1984, Buzbee entered a plea to first-degree rape in Case No. 29687. He was sentenced to life imprisonment. The State entered a nolle prosequi to burglary and first-degree sexual offense, the remaining counts in this indictment, and to the three counts—

---

**2.** In *Buzbee v. State,* 58 Md.App. 599, 473 A.2d 1315, *cert. denied,* 300 Md. 794, 481 A.2d 239 (1984), this Court upheld Buzbee's convictions for the kidnap and rape of a 15–year–old girl.

first-degree rape, burglary and robbery, in a companion case, No. 29686. The interpretation of the plea agreement in Case No. 29687 is at issue in this appeal.

## The Instant Prosecution

In its October 15, 2009 indictment, the grand jury charged Buzbee with offenses involving four separate victims that took place from 1977 through 1980. On March 16, 2010, appellant moved to dismiss the indictment, asserting, *inter alia,* that the instant prosecution constituted a breach of the plea agreement.[3] A hearing was conducted on March 19, after which the circuit court denied appellant's motion to dismiss. This appeal followed. We will recite additional facts as necessary to address the issues before us.

## DISCUSSION

At issue in this case is whether the circuit court erred by denying Buzbee's motion to dismiss the 2009 indictment. He claims that his plea agreement with the State in 1984 foreclosed any additional prosecutions. The State responds that we should dismiss Buzbee's interlocutory appeal. In the alternative, the State maintains that the circuit court properly denied Buzbee's motion to dismiss.

## Interlocutory Appeal

■ We must at the outset determine our jurisdiction to entertain Buzbee's appeal. The State insists that this appeal is not properly before us. Buzbee contends otherwise, and for support cites to our decision in *Rios v. State,* 186 Md.App. 354, 974 A.2d 366 (2009) as authority for our jurisdiction in this matter. We agree that *Rios* controls, and will proceed to address the merits. We explain.

■ "The general rule as to appeals is that, subject to a few, limited exceptions, a party may appeal only from a final

---

3. The circuit court also denied appellant's claim that the 2009 indictment must be dismissed because of a considerable pre-indictment delay. The denial of that motion is not before us.

judgment." *Nnoli v. Nnoli,* 389 Md. 315, 323, 884 A.2d 1215 (2005). *See Salvagno v. Frew,* 388 Md. 605, 615, 881 A.2d 660 (2005). The final judgment rule is embodied in Section 12–301 of the Courts Article. Md.Code (1974, 2006 Repl.Vol., 2008 Supp.), § 12–301 of the Courts & Judicial Proceedings. The rule is subject to limited exceptions:

> [T]here are only three exceptions to that rule: appeals from interlocutory orders specifically allowed by statute, predominantly those kinds of orders enumerated in Maryland Code, § 12–303 of the Cts. & Jud. Proc. Article; immediate appeals permitted under Maryland Rule 2–602(b); and appeals from interlocutory rulings allowed under the common law collateral order doctrine.

*Anne Arundel County v. Cambridge Commons,* 167 Md.App. 219, 225, 892 A.2d 593 (2005) (quoting *Board of Education v. Bradford,* 387 Md. 353, 382–83, 875 A.2d 703 (2005) (further citations omitted)), *cert. denied,* 393 Md. 242, 900 A.2d 749 (2006). The first two exceptions do not apply in this case.[4] We must therefore determine whether the circuit court's order constitutes an appealable collateral order.

In *Rios,* the defendant—Rios—thought that he had entered into an agreement with the State pursuant to which the prosecution would dismiss all but one of a variety of charges against him, and that as to the remaining count he would enter an *Alford* plea. When the prosecutor denied the existence of that accord, Rios sought its enforcement in the trial court by filing a motion to seek that relief. The court denied relief, and Rios appealed to challenge the circuit court's order.

---

4. "A general grant of appellate jurisdiction is provided in Sections 12–301 and 12–308 of the Courts and Judicial Proceedings Article for the review of 'final' and 'reviewable judgments.'" *Rush v. State,* 403 Md. 68, 100, 939 A.2d 689 (2008). Section 12–303 of the Courts Article governs the right to appeal from certain interlocutory orders in civil cases, and lists specific exceptions to the final judgment rule. *See* Md.Code (1974, 2006 Repl.Vol., 2008 Supp.), § 12–303 of the Courts & Judicial Proceedings Article. Section 12–308 provides in part that the Court of Special Appeals "has exclusive initial appellate jurisdiction over any reviewable judgment, decree, order or other action of a circuit court[.]"

We rejected the State's motion to dismiss Rios's appeal, disagreeing with its position that we lacked jurisdiction because Rios sought review of an interlocutory order. Instead, we concluded that Rios's appeal satisfied the collateral order doctrine, which comprises one of "three limited exceptions" to the final judgment rule. *Rios*, 186 Md.App. at 363, 974 A.2d 366 (citing cases). We there observed that the order denying enforcement of the plea agreement satisfied the requirements for an appealable collateral order. We drew extensively from language in *Hudson v. Housing Authority of Baltimore City*, 402 Md. 18, 25-26, 935 A.2d 395 (2007), in which the Court of Appeals observed:

> The collateral order doctrine permits a reviewing appellate court to treat as final, without consideration of the procedural posture of a case, a "narrow" class of interlocutory orders in "extraordinary circumstances." ... We have applied gingerly this doctrine to review actions completely separate from the merits of the litigation based on a "perceived necessity" of immediate appellate review.
>
> \*　　\*　　\*
>
> The collateral order doctrine may apply when a decision of the lower court meets four conjunctive and strictly construed elements.... If an interlocutory decision "(1) conclusively determines the disputed question, (2) resolves an important issue, (3) resolves an issue that is completely separate from the merits of the action, and (4) would be effectively unreviewable if the appeal had to await the entry of a final judgment," then the collateral order doctrine applies.

In *Rios*, we concluded that the circuit court's decision not to enforce a plea agreement met all of these elements:

> The State correctly does not contest that the decision meets the first two elements of the doctrine. First, the decision conclusively determined whether the parties entered into a plea agreement, the primary issue on appeal. *See Jackson, supra,* 358 Md. at 267, 747 A.2d 1199 ("denial of the petitioner's motion to dismiss conclusively deter-

mines—answers—the question of the enforceability of the agreement between the parties"); *Clark* [*v. Elza* ], *supra,* 286 Md. [208] at 213, 406 A.2d 922 [ (1979) ] ("the order finally resolved the disputed question of whether the plaintiffs were bound by their oral settlement agreement"). Second, this issue is important to the case, as a decision favorable to Rios would result in the dismissal of every charge but one, and obviate the need for trial. *See Jackson, supra,* 358 Md. at 267, 747 A.2d 1199 (enforceability considered an important issue where judgment for appellant would result in dismissal of all criminal charges).

The State does contest, however, whether the third and fourth elements of the collateral order doctrine are met. But the third element is satisfied because the existence of an enforceable plea agreement is an issue independent of appellant's guilt or innocence. *See Jackson, supra,* 358 Md. at 270, 747 A.2d 1199; *Courtney, supra,* 98 Md.App. at 658, 635 A.2d 8. And the fourth element is satisfied because the existence of a plea agreement is effectively unreviewable after proceeding to trial and verdict, given that an important purpose of making a plea agreement is to avoid the expense, inconvenience, and uncertainty of a trial. The defendant's rights cannot be fully vindicated if he is compelled to wait for a final judgment. *See Jackson, supra,* 358 Md. at 270–71, 747 A.2d 1199; *Clark, supra,* 286 Md. at 213, 406 A.2d 922; *Courtney, supra,* 98 Md.App. at 658–59, 635 A.2d 8.

*Rios,* 186 Md.App. at 365, 974 A.2d 366. We emphasized that the "enforceability of alleged plea agreements is a proper basis for interlocutory appeals because of the strong public policy that favors the plea negotiation process." *Rios,* 186 Md.App. at 366, 974 A.2d 366 (citing *State v. Brockman,* 277 Md. 687, 693, 357 A.2d 376 (1976)). This Court in *Rios* relied on the holding in *Jackson v. State,* 358 Md. 259, 747 A.2d 1199 (2000), in which the Court of Appeals emphasized that "what [Jackson] bargained for was the right not to be tried, to have the charges against him dismissed. If that bargain means anything at all, it is that if he fulfills his end of the bargain, he

does not have to go to trial and thus may not be haled into court at all." *Jackson,* 358 Md. at 270–71, 747 A.2d 1199. The right to avoid trial most certainly could be vindicated only prior to any trial. *See id.* Quoting from *Courtney v. Harford County,* 98 Md.App. 649, 658, 635 A.2d 8 (1994), the *Jackson* Court observed that "[i]f the defendants must proceed to a trial on the merits, this contractual benefit [from an agreement] will be irretrievably lost." *Jackson,* 358 Md. at 270, 747 A.2d 1199.

Seeking to distinguish *Rios,* the State contends that the interlocutory appeal in *Rios* was from a denial of Rios's motion to enforce a plea agreement. The State points out that Rios and the prosecution had differed over whether they had in fact reached an agreement. According to the State, Buzbee instead seeks to "preclude his prosecution based on his earlier guilty plea[.]" The State continues that, "[u]nlike in Rios's case, where the issue was whether the parties had entered into a plea agreement, there is no dispute that Buzbee entered an agreement[.]" The State assures us that Buzbee's complaint, that the agreement was violated, "can await completion of his trial and is reviewable after final judgment if he is convicted."

We are not persuaded by the State's approach. There is no substantive difference between *Rios* and the instant case. Whether a defendant seeks to enforce an agreement, the existence of which is denied outright by the State, or whether the parties quibble over its terms, the root issue is whether Buzbee, as did Rios, can argue pre-trial that he thought he had a bargain with the State that would preclude any further prosecution. In any event, Buzbee's motion to dismiss effectively rests on the enforcement of the agreement as he interprets the accord. In the final analysis, we discern no effective distinction between the subject of the appeal in *Rios* and the subject matter of instant appeal.

The circuit court's decision *sub judice* satisfies the elements for the application of the collateral order doctrine. The order conclusively resolved the scope of the parties' agreement.

Following *Rios,* we conclude that the importance of a circuit court's decision can not be overstated. Maryland cases have emphasized the "right not to be tried." *See Rios,* 186 Md. App. at 365, 974 A.2d 366. Whether a defendant seeks *enforcement* of an agreement, or its favorable *interpretation,* the "right not to be tried" is implicated. Moreover, the interpretation of the agreement offers an issue separate and distinct from the issue of Buzbee's guilt or innocence. Finally, because the existence of the accord at issue, and its preclusive effect, *vel non,* is effectively unreviewable, we conclude, following *Rios* and *Jackson,* that the circuit court's order in the case before us qualifies as an appealable collateral order.[5]

### Nature and Extent of the Plea Agreement

Our discussion of the parties' contentions with respect to the interpretation of the agreement relies on testimony of two relevant hearings in this matter.

### 1984 Hearing

The plea hearing at issue was conducted on June 25, 1984. The terms of the agreement were recited as follows:

[MR. HAMILTON:] If I might outline the terms of the agreement under which the defendant is going to be proceeding today. That this is pursuant to an agreement that was worked out between Mr. Bours on behalf of Mr. Buzbee and myself on behalf of the State's Attorney's office.

That Mr. Buzbee would be entering a plea of guilty to the first count in Criminal Case No. 29687 which charges the offense of rape in the first degree. That is a felony under

---

5. We are certainly mindful of the parsimonious application of the collateral order doctrine. *See generally Kurstin v. Bromberg,* 191 Md. App. 124, 136–46, 990 A.2d 594 (2010) (citing cases). Indeed, federal cases are uniform in holding that an interlocutory order relating to a non-prosecution agreement similar to that now before us does not qualify for immediate appellate review. *See, e.g., United States v. Ledon,* 49 F.3d 457, 459–60 (8th Cir.1995). *Cf., e.g., United States v. Wampler,* 624 F.3d 1330, 1333–37 (10th Cir.2010) (enforcement of failed agreement; collecting cases). Notwithstanding, we believe that *Rios* controls.

Maryland statute by which, for which the maximum period of incarceration would be up to a life sentence. He would be, of course, withdrawing any previously entered plea of not guilty in that case.

It is contemplated that the defendant would be fully admitting his guilt to this offense tendering neither an *Alford* plea or a nolle contendere plea or any other sort of statement before the Court in any way limiting his liability or responsibility for this particular offense. The plea would be presented to the Court pursuant to the provisions of Maryland Rule 733 to the following extent: that the Court would be free to impose up to the maximum sentence for this case which would be life in imprisonment but that the limitation under Rule 733 would be that any sentence imposed would commence November 5, 1982.

There is no sentence that is binding on the Court in this case. In other words, it could be anywhere from a life sentence on down. At the time of sentencing and the State has no objection to the matter proceeding to sentencing today. If everyone else is in accord with that, the State would enter nolle prosequis to the remaining counts in 29687 as well as to the indictments in 29686 and to the charging document in 30479. 30479 is a misdemeanor case in which the defendant was convicted in District Court and in fact had already served the maximum period, in excess of the maximum period of incarceration by the time the case had reached the trial level in the District Court. And I believe that would be the—

[THE COURT:] Is that your understanding, Mr. Bours?

[MR. BOURS:] Just about, Your Honor, one other matter that Mr. Hamilton and I talked about and he confirmed today but just did not mention on the record is that Mr. Buzbee was originally indicted in this case in this court in seven separate cases, 29681 through 29687. Two of the other cases have previously been nolle prossed, Criminal No. 29682 and 29684 and of course it is the law that a nolle prosequis enter[ed] before any testimony or before jeopardy attaches does not operate as an acquittal on a charge and

those charges could be brought back or reindicted at some future date. Mr. Hamilton has agreed that in consideration of Mr. Buzbee pleading guilty and if the Court decides to accept his guilty plea in 29687, that the State under no circumstances will reindict or recharge the conduct, the incidents, the events, whatever you want to describe it that were originally indicted in Criminal Nos. 29682 and 29684 even if they got additional evidence at some future point that those offenses may have been committed by Mr. Buzbee.

The court then inquired whether there were any additional agreements:

Q ... All right, now you are pleading guilty after you have, you or your counsel has had discussions with the State's Attorney. Was there any agreements made that were not presented to me today?

A No, sir.

Following an extensive examination of the defendant, the court accepted the plea, and proceeded to sentencing.

*2010 Hearing*

At issue here is whether the parties to the 1984 plea agreement contemplated that the State would not prosecute Buzbee for any additional rapes. On March 19, 2010, the circuit court conducted a hearing on Buzbee's motion to dismiss the 2009 indictment. Barry Hamilton,[6] then the Assistant State's Attorney who was prosecuting Buzbee, and Buzbee's then counsel Reginald W. Bours, III, testified. In addition, the circuit court also heard from Detective Joseph Mudano, of the Montgomery County Police Department cold case unit.

---

**6.** Mr. Hamilton has since been appointed to the District Court of Maryland. Judge Hamilton will be referred to in this opinion as "Mr. Hamilton."

Mr. Hamilton and Mr. Bours had discussed possible dispositions of some of the outstanding cases. The latter recalled the preliminary discussions that led to the plea agreement:

[MR. BOURS:] I found my original notes from September of '83—a discussion with him where we were discussing what would happen if Mr. Buzbee did plea. And during that period of time, Mr. Hamilton was offering a 20 year deal. It would be binding on whatever judge took it for the remaining case or cases in which any plea was entered. And we took that offer to many different judges in the fall of 1983. Judge Mitchell turned it down. Judge Miller turned it down. Judge Mitchell wrote a short letter to us dated October 31 indicating that. Judge Miller wrote a somewhat longer letter which I've shared with Mr. Maloney and described, turning down the plea for the 20 years.

I can't tell you exactly when we started discussing a different length of sentence, but eventually we did discuss just pleading to one or two first degree rapes, which carry a life maximum and with the understanding, and the only real plea concession would have been that the sentences began on November 5, 1982, the date of Mr. Buzbee's arrest. So that was discussed. And to make a very long story short, that was eventually accepted by Judge Cahoon (phonetic sp.).

[DEFENSE COUNSEL:] Okay, now during your representation of Mr. Buzbee, and conversations you were having [with] Mr. Hamilton regarding plea negotiations and whatnot, were you, as Mr. Buzbee's attorney, concerned with any possibility of other charges, cases that had not yet been charged that might be out there, other sexual assaults that he might get—Mr. Buzbee might get accused of?

A  Absolutely.

Q  Were you concerned about that?

A  Absolutely. The basic police report that I was furnished as part of discovery listed eight or nine cases and only one or two of which were among the ones that were indicted. So there were quite a number of other cases that

were listed in the basic police report. I was of course aware of publicity at all times when we were discussing the case and the publicity at the time was that the police had 17 or 18 rapes between 1981 and 1982 that they had investigated as part of the "Aspen Hill Rapist" problem. So we were always interested in those. And then Mr. Hamilton dropped two cases without trial. So of course that did not operate—two of the indicted cases, that did not operate as an acquittal. And so explicitly we talked about the fact that we would not recharge those two cases.

And we explicitly talked about he would not—if Mr. Buzbee pled—he would not file charges in any other case. The most explicit notes I have on that come from I believe September of '83.

Mr. Bours also testified that he took detailed notes of his conversations with police and the prosecutor. He described his notes, and his testimony reflects his understanding of the negotiations and agreement:

And these notes indicate that Mr. Hamilton called me at 3:30 p.m. on September 13, 1983. And I stand by these notes as being exactly what happened at the time, because it was my practice to write things down to make sure that I could remember them. I don't actually remember every word in it, but I would say this is absolutely what he told me.

Q    Okay, and can you just—what's the nature of the conversation that you had and what do you—

A    Well, here's the context. There were two cases left that had not been tried. We either had trials or nolle prosses up to this point. And as of September 13, 1983, the two cases that were left went by the name W[.] and S[.].[7] . . . Those were the last two cases that had not yet been tried.

Mr. Hamilton told me he had no plans to re-indict Buzbee, Mr. Buzbee, on the old cases, and would not do so if he

---

**7.** It is unnecessary to name the assault victims in this case. *See Muthukumarana v. Montgomery County,* 370 Md. 447, 458 n. 2, 805 A.2d 372 (2002).

pled in the W[.] and S[.] cases. He also told me he had no plans on other uncharged cases and he said he didn't want to bind himself if, for example, the defendant is implicated in murder or a serious injury rape. But he had absolutely no plans as of September 13, 1983 to indict any other uncharged cases. And there was a pending trespass case that I think was on appeal from the district court that was kind of the first thing in the investigation of Mr. Buzbee that led to his ultimate arrest. That case was going to be dropped, he said.

And then we had a discussion about if Mr. Buzbee pled guilty on the W[.] and S[.] cases, and the two cases that were then on appeal, which were K[.] and H[.]—were reversed and had to be retried. We had a discussion about whether the pleas in these cases would be used to impeach Mr. Buzbee should he testify in any future trial after a reversal on appeal.

And Mr. Hamilton's position was that he would not agree not to use those for impeachment purposes. And he was consistent on that all through the negotiations, up until the very end. In other words, when Mr. Buzbee did eventually enter a plea in the S[.] case, it could have been used against him for impeachment purposes had he gone to trial or retrial after or reversal on appeal.

Mr. Bours recalled that, after the plea, two of the investigating detectives asked to discuss additional cases with Buzbee. They had explained to Mr. Bours that, since they thought that Buzbee would not be charged in any more cases, Buzbee could speak with them about open cases. Buzbee declined.[8] Mr. Bours emphasized that the prosecutor agreed not to prosecute Buzbee in any case where he was a suspect, save for an instance of homicide or serious injury.

---

8. Mr. Bours recalled that "[t]he substance of the conversation [with the detectives] was that now that he can't be prosecuted—this would be Beasley or Hutchinson talking—now that he can't be prosecuted for any of the cases that we had open on him, we'd like to sit down with him and try to close out our file."

On cross-examination, Mr. Bours conceded that the full extent of the plea agreement was not on the record of the guilty plea hearing:

Q  And did the judge bind himself to that plea agreement?

A  I'm sure he did.  We wouldn't have entered it if he hadn't.

Q  The question I'm building up to is why is there nowhere in the transcript or the plea this part of the agreement that there will be no further prosecutions of these other cases?

A  I can only give you an opinion on that, Mr. Maloney. And my opinion would be that nobody wanted to advertise that that's what we had agreed to do.  We did not want all the uncharged victims to feel like they were being given short shrift or ignored in this process.  And so I am sure Mr. Hamilton did not want to advertise to the public in general that nobody else would be prosecuted and no other uncharged case would be prosecuted because there were victims in those cases, too.

Q  And that's your opinion.  You don't really know, is that what you're saying?

A  Well, I think it was implicit in all our discussions. We're going to—what we're going to do is this.  And then you, Mr. Hamilton, or you, the State's Attorney's office for Montgomery County is not going to prosecute him any more.  We agreed to that in no uncertain terms between ourselves whether we ever put it in front of Judge Cahoon or any other judge or said it publicly, that was our agreement.

Q  So you're saying there's a side agreement, a gentleman's agreement between you and Mr. Hamilton that was not part of the plea negotiations?

A  No.  It was part of the plea negotiations.  It was not part of the record in open court.

Q  So are you saying there's two different pleas, there's one that the Court was part of and a separate part that was just between you and Mr. Hamilton?

A   No.   What I'm saying is that the cases that had not yet been charged were never going to be charged.   That was my agreement with the State's Attorney's office for Montgomery County through Mr. Hamilton, who was negotiating.

Q   Did Judge Cahoon incorporate that in any way?   Was he ever told about that?

A   You know, I haven't read the transcript of the plea itself, Mr. Maloney, but I'm sure he wasn't.   I'm sure he wasn't told that.   Well, I'm not sure he wasn't told that, but I'm sure that it was not part of the public record, for the reasons I've just stated.

Mr. Bours later clarified the scope of his understanding:

Q   That's the point I'm trying to make.   It's always a plea agreement to known cases.   Have you ever seen this agreement for unknown cases?

A   Let me try to put it this way.   If Mr. Hamilton or the detectives had come to me before we went to trial and given me a list of all the cases and given me discovery on each of the cases, I would be willing to say to you today that was it. That we were only talking about those cases.   But the State, for whatever reason, or the police, for whatever reason, never gave me information about the uncharged cases except at a bare minimum the name of the alleged victim and the date of the alleged offense that appears in some of these reports.   So our discussions and my very clear understanding is that anything that happened before his arrest that was then known to the State or otherwise, as long as it was in the same category, was out of bounds.

Q   The category being cases that he was a suspect in?

A   No.   Rape cases or rape and related conduct cases.   As long as there was no serious injury to the victim.

\*         \*         \*

Q   So you're giving us that laundry list—rape, robbery, assault—they also could not be charged is what you're saying?

A   Right.

When reminded by the prosecutor that such an open-ended plea agreement was unique, where the State would forego any further prosecution for even then unknown offenses, Mr. Bours responded:

A   The term in the case at hand was completely open.   It was we're not charging him with any more.   Okay, we're not going to try him.   After you enter this plea, because presumably part of the plea agreement was he had to testify under oath and admit under oath his guilt on the last case, the one that Judge Cahoon heard—Mr. Hamilton wanted a completely unassailable guilty finding that would never result in reversal on appeal or what have you.   And he argued for and got a life sentence.   And they—that was it.   That's the only way I can put it.

Mr. Hamilton took the stand, and his testimony conflicts with Mr. Bours's recollection of the agreement:

Q   All right, let's cut to the quick to the issue on the table now.   Did you make any type of plea agreement with Mr. Bours that his client, Timothy Buzbee will not be prosecuted for any uncharged or unknown rapes when he made a plea in this case in 1984?

A   No, I made no such agreement.

Q   And I'll ask you the question I asked Mr. B ours—have you ever heard of a prosecutor ever giving a blank check—we'll never prosecute for cases known or not known to your client being involved with?

A   No. I mean, I have—I never was involved in such a thing.   And in the discussions that you and Ms. Grimes and I have had about this, the only way I could see that that set of circumstances would happen was that it would be accompanied by what I would call a "Come to Jesus" meeting with the defendant where he or she would layout everything, everything they've ever done from birth until that moment.

Q   Did that ever happen with Mr. Buzbee?

A   Absolutely not.   Absolutely not.   We never got one word of any admission of any misconduct from Mr. Buzbee

except the statement of guilt extracted by Judge Cahoon at the plea.

* * *

A   Again, without looking at it, it would have been contrary to my unvarying practice—and this was one of the two biggest cases I handled in my entire time in the State's Attorney's office—not to put the entirety of the agreement on the record.

Q   Was there any side agreement between you and Mr. Bours that you did not put on the record because of fear of publicity?

A   I don't think so.   I do agree with Mr. Bours that the cases that we knew about, the ones where we brought people in for the lineup that night where they failed to make identifications, those cases were not going to be revived. But there was never anything about cases where we had no connection of Mr. Buzbee to them.   And Mr. Bours cited that I said it could involve a homicide, it could involve serious injury to a victim—those were only examples of the reasons that I wasn't about to sign a blank check.   And the way Mr. Bours described Andy Sonner's management style was absolutely correct.   He invested an incredible amount of trust in the people that worked for him.   But we also knew the points at which we could not possibly make a move without consulting him.   And that would have been one of them.   No way would I have ever given him a blank check without having any specific authority and approval on that. And I'm sure he would never have granted it again without the "Come to Jesus" meeting.

Mr. Hamilton emphasized that he was "not signing off on something [he] knew nothing about."

At the time of the hearing, Detective Joseph Mudano had served with the Montgomery County Police Department for 30 years, with the most recent five years spent with the cold case unit.   He testified that, based on his review of the original files and the current records, that he had not seen the names

of the four alleged victims in the present indictment in the records from the early cases.

The circuit court denied the motion to dismiss, ruling as follows:

All right. We're here on the defendant's Motion to Dismiss the indictment in this case on two grounds. One of the grounds that's being requested in support of the dismissal is the delay of some 30 years between the alleged commission of these crimes and the date of indictment.

\*　　\*　　\*

The second aspect of this motion to dismiss arises out of the defendant's assertion that there was a plea agreement entered into between the State and the defendant back in 1984 which essentially committed the State to not prosecute the defendant for any other rape. The counsel have both referred to page 12 of the transcript of the plea that was taken back on June 25, 1984, which is Joint Exhibit 1, which the Court inquires of Mr. Buzbee, who is under oath at that time,

"Question: Are you pleading guilty after you have, you or your counsel, has had discussion with the State's attorney? Was there any agreement made that was not presented to me today?"

"Answer: No, sir."

Now, I understand what Mr. Shefferman is saying. Certainly, it's a defendant responding and you know, there may certainly be some difficulty by the defendant in speaking up and putting everything that was on the record that needs to be, that was agreed to, put it on the record so that it's clear. He certainly had counsel present who would have been able to and did in fact correct some matters on the record. I would note that on page 26 of the transcript in which Mr. Bours is going into his presentation, in which he states that "probably one of the bases for the guilty pleas and one of the reasons why guilty pleas are encouraged to some extent is because both sides get something out of the guilty plea. Mr. Buzbee in a way gets something out of this in the sense

that this is the end as far as he's concerned as to the seven charges that have been placed against him. And the remaining cases, if the appeals result in new trials, will be retired, I presume. At any rate, this puts an end to the trials and it makes certain that he can devote himself to some hope; at least, of rehabilitation."

Now, I understand Mr. Bours' position with respect to not wanting to put things in the record, that there was some concern that if uncharged victims learned that there had been a side deal entered into that precluded the State from prosecuting those other cases, that given the publicity involved, that perhaps that wasn't put on the record in order to address that concern.

But what is on the record is clear, that that is in essence the plea agreement. The seven charges that were placed against him would not be prosecuted. I've reviewed Defendant's Exhibit No. 3, which were the notes taken by Mr. Bours following the letter dated September 12. It was sent by Mr. Bours to the prosecutor in this case.

And the September 12 letter, which is Defendant's Exhibit 2, in the second full paragraph specifically states, "In an area that is somewhat less clear in my mind, I know we have also discussed the other charges that have been pending against Mr. Buzbee in criminal nos. 29681 through 28687. Two complete cases have been dropped, namely criminal nos. 29682 and 29684. At one time you indicated that those indictments might be revived. But I believe the overall nature of our discussion on this plea agreement carries with it the tacit understandings that you will not revive those two indictments once the defendant has entered a guilty plea on these two. I would also assume that once the defendant has admitted guilt in two cases, your office has no significant interest in prosecuting him on any other charges, whether previously indicted or not."

And obviously, the operative language is "I would assume." There's no agreement that's been entered into. In a subsequent telephone conversation, Defendant's Exhibit 3, number 2 of the notes—"No plans on uncharged cases

either, but doesn't want to bind himself, if, for example, defendant is implicated in murder or serious injury rape. No hint he had defendant on burglary, et cetera." Again, the operative words there are "no plans on other uncharged cases."

Judge Hamilton's testimony is specific, and that is that he did not enter into any plea agreement that Mr. Buzbee would not be prosecuted for any uncharged or unknown rapes. It's further specific that if there was going to be in essence a blank check agreement to not prosecute Mr. Buzbee on other unknown or uncharged rapes, that that agreement would first have to be approved by the State's Attorney at the time, Mr. Sonner, and would be accompanied by a full disclosure meeting with the defendant during which he fully disclosed his involvement in any and all criminal cases.

Judge Hamilton further agreed that the cases that were subject to his understanding with Mr. Bours were only those cases that the State knew about at the time which were those cases in which the people who had come in to view the lineup failed to make any identification, not those other cases that had no connection with Mr. Buzbee.

As Detective Mudano testified, the cases that are under indictment in this case are cases that had no prior connection with Mr. Buzbee. The complaining witnesses identified in the cases under indictment in this case—there's no reference to those individuals, either in Defendant's Exhibit 6 or in any other cases. These complaining witnesses are not identified in cases which have been referenced as cases closed by exception by the police at the time in which they believed the defendant was a suspect and they had no reason to believe that in fact he was a suspect in those cases.

Accordingly, I'm satisfied that the plea agreement that was entered in this case back in 1984 has not been violated by the State's subsequent indictment of Mr. Buzbee in these cases, and that the plea agreement was honored in the

fashion in which it was entered into and met and I will deny the motion to dismiss.

## Analysis

Plea agreements are, as an initial matter, construed according to contract principles. *See Cuffley v. State,* 416 Md. 568, 579, 7 A.3d 557 (2010) (citing *Tweedy v. State,* 380 Md. 475, 482, 845 A.2d 1215 (2004)). The interpretation of a plea agreement, however, is also informed by due process and principles of fundamental fairness, so that standards of contract interpretation alone are "not enough to resolve disputes over the proper interpretation of a plea bargain.' " *Cuffley,* 416 Md. at 580, 7 A.3d 557 (quoting *Solorzano v. State,* 397 Md. 661, 668, 919 A.2d 652 (2007)). *See generally Santobello v. New York,* 404 U.S. 257, 261–62, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). Courts must "construe the terms of a plea agreement according to the reasonable understanding of the defendant when he pled guilty." *Solorzano,* 397 Md. at 668, 919 A.2d 652.

We conclude that the circuit court did not err in concluding that the plea agreement did not obligate the State not to prosecute any and all additional charges, such as those brought by indictment in the instant case. At the time the circuit court accepted the plea agreement, such accords were governed by Maryland Rule 733.[9] the Rule provided in relevant part:

**Rule 733.   Plea Agreements.**

a.   *Conditions for Agreement.*

The defendant or his counsel may enter into an agreement with the State's Attorney to plead guilty or nolo contendere

---

**9.**   "Pursuant to a Rules Revision effective 1 July 1984, Title 4 of the Maryland Rules replaced Chapter 700 of the former Rules[.]" *State v. Daughtry,* 419 Md. 35, 57, 18 A.3d 60 (2011). The plea hearing took place five days before the effective date of Rule 4–243.

on any proper condition including one or more of the following conditions:

\*     \*     \*

4. That the State will not charge the defendant with the commission of certain other offenses;

\*     \*     \*

d. *Record of Proceedings.*

All proceedings pursuant to this Rule, including tender of the plea, advice by the court inquiry into the voluntariness of the plea or plea agreements, and inquiry into the factual basis for the plea shall be on the record. If the parties stipulate to the court that disclosure of the plea agreement or any term thereof would cause a substantial risk to any person of physical harm, intimidation, bribery, economic reprisal or unnecessary annoyance or embarrassment, the court may order that the record be sealed subject to terms it deems appropriate.

Examining the language of Md. Rule 4–243, the successor to Rule 733, the provisions in effect at the time of the plea in this case, the Court of Appeals recently emphasized:

The record of that proceeding must be examined to ascertain precisely what was presented to the court, in the defendant's presence and before the court accepts the agreement, to determine what the defendant reasonably understood to be the sentence the parties negotiated and the court agreed to impose. The test for determining what the defendant reasonably understood at the time of the plea is an objective one. It depends not on what the defendant actually understood the agreement to mean, but rather, on what a reasonable lay person in the defendant's position and unaware of the niceties of sentencing law would have understood the agreement to mean, based on the record developed at the plea proceeding. It is for this reason that extrinsic evidence of what the defendant's actual understanding might have been is irrelevant to the inquiry.

*Cuffley v. State,* 416 Md. at 582, 7 A.3d 557 (2010) (footnote omitted). As noted, Rule 733d required that "All proceedings pursuant to this Rule . . . shall be on the record." *See Banks v. State,* 56 Md.App. 38, 53, 466 A.2d 69 (1983) (stating that "provision that is deemed material to a plea agreement should be stated on the record."). The Court noted in *Cuffley* that the "principal purpose of Rule 4-243 is to eliminate the possibility that the defendant may not fully comprehend the nature of the agreement before pleading guilty. Any less would offend notions of due process." *Cuffley,* 416 Md. at 581, 7 A.3d 557 (citing *Santobello v. New York,* 404 U.S. at 261–62, 92 S.Ct. 495).

In this case, Buzbee's defense counsel, Mr. Bours, acknowledged at the hearing on his motion to dismiss that not all of the terms of the agreement were placed on the record at the plea. Indeed, he testified that the extent of supposed agreement by the State not to prosecute was concealed from the public because of the anticipated repercussions.

We review *de novo* the terms of the agreement as placed on the record at the appropriate guilty plea hearing. *Cf. Tweedy v. State,* 380 Md. 475, 482, 845 A.2d 1215 (2004) (determination whether plea agreement violated presents question of law); *Rankin v. State,* 174 Md.App. 404, 408, 921 A.2d 863 (same), *cert. denied,* 400 Md. 649, 929 A.2d 891 (2007). Based on this scrutiny, we conclude that the plea agreement does not preclude the instant prosecutions. The recitation of the agreement at the plea hearing does not support Buzbee's claim that the State undertook to abandon all other potential cases, save for murder or cases involving serious injury.

**ORDER DENYING MOTION TO DISMISS AFFIRMED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR TRIAL.**

**APPELLANT TO PAY COSTS.**